IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JULIE A. BUSSING,

                Plaintiff,

vs.

COR CLEARING, LLC, et al.,

                Defendants.

8:12-CV-238

MEMORANDUM AND ORDER

This matter is before the Court on the parties' objections (filings 74 and 76) to the Magistrate Judge's Findings and Recommendation (filing 70), recommending that the Court grant in part and deny in part the defendants' motion to dismiss (filing 26), and recommending that the Court deny the plaintiff's motion to file her proposed third amended complaint (filing 63), but with leave to submit a new third amended complaint reasserting her state law claims in a manner consistent with the Findings and Recommendation. For the reasons discussed below, the Court will accept in part, and reject in part, the Magistrate Judge's recommendations. The specific implications of this decision for the parties' underlying motions (filings 26 and 63) will be discussed in greater detail below.

## I. FACTUAL BACKGROUND

Plaintiff Julie A. Bussing has worked in the securities industry since 1989.[1] She is licensed as a Certified Public Accountant, holds a Masters of Business Administration, and she has been qualified to hold several Financial Industry Regulatory Authority (FINRA) licenses.[2] Filing 63-1 at ¶¶ 12–13. Bussing alleges that from her long career in the area, she has obtained a comprehensive familiarity with trading, clearing operations, finance,

---

[1] This recitation of the facts is taken primarily from Bussing's proposed third amended complaint. Filing 63-1. The Court has used that complaint because it is Bussing's first pleading that was drafted with the benefit of counsel, and because it concisely sets forth the material allegations also contained in her previous, *pro se* pleadings. *See*, filings 1, 19, and 34. The Court will refer to this latest proposed pleading as Bussing's "operative complaint."

[2] FINRA is a private, non-profit corporation that is registered with the SEC as a "national securities association." *Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013). This was made possible by the Maloney Act, 15 U.S.C. §§ 78o *et seq.*, which provided for the establishment of self-regulatory organizations to oversee the securities markets. *Aslin*, 704 F.3d at 476.

accounting, and compliance with the rules and regulation of FINRA and the Securities and Exchange Commission (SEC). Filing 63-1 at ¶ 14.

In September 2011, Bussing began working as an independent contractor for defendant COR Securities Holdings, Inc. ("COR"), a private investment management company. During this period, Bussing was retained by and reported to defendant Steven Sugarman, who was a director of COR as well as its CEO. Filing 63-1 at ¶¶ 5, 15. Part of her duties involved assisting with the due diligence for COR's acquisition of Legent Clearing, LLC ("Legent"). Legent, which was headquartered in Omaha, provides clearing services to brokerage clients, and is now COR's wholly owned subsidiary. Filing 63-1 at ¶¶ 2, 4.

Before its acquisition by COR, Legent had been involved in several regulatory investigations and examinations. From 2009 to 2011, FINRA investigated and sanctioned Legent for various violations of FINRA rules and federal securities laws, including anti-money laundering provisions and the Bank Secrecy Act of 1970, 31 U.S.C. § 5311, *et seq.* Filing 63-1 at ¶¶ 18–19. Bussing learned of these issues through her investigation for COR. Filing 63-1 at ¶ 25.

As part of her duties related to COR's acquisition of Legent, Bussing also worked to develop a "Change of Control Plan." Filing 63-1 at ¶ 15. The plan was designed to ameliorate Legent's "'troubling' regulatory history" and was approved by COR for implementation immediately after it completed its acquisition of Legent, during the first half of 2012. Filing 63-1 at ¶¶ 16–17.

Beginning in November 2011, Sugarman recruited Bussing to work for and lead Legent as its Executive Vice President. Filing 63-1 at ¶ 24. Bussing initially declined to work for Legent based on the results of her investigation. Filing 63-1 at ¶ 25. She alleges that "Sugarman, Legent, and COR (and their respective officers and directors) made certain assurances to . . . induce her to accept employment with Legent." Filing 63-1 at ¶ 26. Bussing claims she was assured she would be authorized to implement the Change of Control Plan and that Legent would enter into a long-term employment agreement with her. Filing 63-1 at ¶ 26.

Bussing and Legent entered into an oral employment agreement, which provided for, among other things, a 3-year term of employment, and allowed Bussing to report directly to Sugarman and the COR Board of Directors instead of defendant Christopher Frankel, Legent's CEO. Filing 63-1 at ¶¶ 7, 27. On January 1, 2012, Bussing began working for Legent as its executive vice president. Filing 63-1 at ¶ 28. Bussing and Legent later entered into a written employment agreement, which was backdated to January 1, 2012. Filing 63-1 at ¶ 44.

Bussing began implementing the Change of Control Plan in January 2012. Filing 63-1 at ¶ 30. Around that same time, FINRA began another investigation of Legent, for the same types of violations that had been found in

previous years. Filing 63-1 at ¶ 20. From January to April, FINRA sent several large document and information requests, and conducted onsite examinations of Legent, all of which resulted in "significant pressure" on Legent's compliance efforts and disrupted Legent's ongoing business operations. Filing 63-1 at ¶¶ 36–41.

On April 23, 2012, FINRA instituted formal proceedings against Legent, alleging that from 2009 and 2010, Legent had failed to comply with the requirements of the Bank Secrecy Act, as well as anti-money laundering and financial reporting responsibilities imposed by various FINRA and SEC rules. Filing 63-1 at ¶¶ 21–22. On April 25, Bussing received a request from FINRA, pursuant to FINRA Rule 8210, to provide "extensive" documents and information, which were to be compiled and made available to FINRA staff when they arrived at Legent's office on April 30. Filing 63-1 at ¶ 48. Bussing alleges that in the course of preparing responses to the request, she identified several potential or existing violations of FINRA rules and federal securities regulations, which FINRA was likely to discover, including violations of the Bank Secrecy Act and anti-money laundering provisions. Filing 63-1 at ¶ 50. During this time, Frankel was the Legent officer ultimately responsible for compliance with various anti-money laundering provisions. Filing 63-1 at ¶ 51.

On April 26, 2012, Bussing met with defendant Carlos Salas, a director of COR, who told Bussing that she had the support of COR management. Filing 63-1 at ¶¶ 6, 52. Sugarman similarly expressed his support of Bussing's investigations and disclosures. Filing 63-1 at ¶ 53. On April 27, based upon violations identified in response to the Rule 8210 document request, Bussing directed Legent staff to cease processing penny stock certificates. Filing 63-1 at ¶ 54. Bussing also directed Legent staff to perform several transactional audits and account reviews, including an audit of all third-party foreign wires from 2011 and 2012. Filing 63-1 at ¶ 55. Later that day, Salas met with Bussing and expressed his dissatisfaction with Bussing's response to the document request and the decision to cease processing penny stock certificates. Filing 63-1 at ¶ 56. Bussing alleges that Salas advocated ignoring or responding incompletely to FINRA's document request. Filing 63-1 at ¶ 56.

Two days later, on April 29, 2012, defendant Jeffrey Sime, an officer of Legent, instructed Bussing to cease preparing a response to the Rule 8210 document request and to cease her audit of Legent's anti-money laundering compliance. Filing 63-1 at ¶¶ 8, 58. Bussing alleges that Sime was so agitated during their meeting that it prompted her to threaten to call security. Filing 63-1 at ¶¶ 58–59. Later that day, Bussing issued a report to COR and Legent which detailed several violations of anti-money laundering provisions and deficits in Legent's internal record-keeping. The report stated that Legent had processed transactions that violated the Bank Secrecy Act and anti-money laundering provisions on a daily basis throughout 2011 and 2012, and that

Legent had likely been used to facilitate money-laundering activities. Filing 63-1 at ¶¶ 60–63. Bussing discussed these findings with Legent and COR management, including Sugarman, Salas, and Frankel. Filing 63-1 at ¶ 64. She alleges that she "was directed by Legent and COR management, including but not limited to Sugarman, Salas, Frankel, and Legent's new CCO to stall, delay, stop digging, and stop responding to the Rule 8210 Document Request or FINRA." Filing 63-1 at ¶ 65. Bussing refused, and participated in FINRA's onsite examination of Legent's offices, which took place from April 30 to May 3. Filing 63-1 at ¶ 66.

On May 4, 2012, Salas allegedly notified Bussing that he, Sugarman, and COR had decided Bussing "needed a vacation," and ordered Bussing to begin taking leave immediately. Salas also told Bussing that when she returned, her position would be changed and he would become Legent's CEO. Filing 63-1 at ¶ 68. Finally, on or around May 20, Bussing was notified that her employment with Legent had been terminated for cause. Filing 63-1 at ¶¶ 72–73.

## II. STANDARD OF REVIEW

This matter is before the Court on the parties' objections to the Magistrate Judge's Findings and Recommendation. There are technically several layers to the standard of review in this case, but as it turns out, the same standard governs most of the Court's substantive analysis. Under 28 U.S.C. § 636(b)(1), a district court may refer matters to a magistrate judge, who will in turn provide proposed findings of fact and recommendations for disposition. Thereafter, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* Following that review, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

Failure to object to a finding of fact in a Magistrate Judge's recommendation may be construed as a waiver of the right to object from the district court's order adopting the recommendation of the finding of fact. NECivR 72.2(f). And the failure to file an objection eliminates not only the need for de novo review, but any review by the Court. *Thomas v. Arn*, 474 U.S. 140 (1985); *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609 (8th Cir. 2009); *see also United States v. Meyer*, 439 F.3d 855, 858-59 (8th Cir. 2006). So, with one exception (which relates to Bussing's claim for tortious interference), this Memorandum and Order touches only upon those aspects of the Findings and Recommendation to which the parties have objected. The Court has reviewed the remaining portions of the Findings and Recommendation, and will accept the Magistrate Judge's recommendations without modification.

Because the Court's analysis of the portions subject to objections is de novo, it is the same as the standard governing the underlying motions to

dismiss and for leave to amend, to which the Court now turns. Following the defendants' motion to dismiss for failure to state a claim (filing 26), Bussing filed a motion for leave to file a third amended complaint, along with a proposed amended complaint. Filings 63 and 63-1. For all practical purposes, the Court's review of these motions has collapsed into a single inquiry: whether Bussing's third proposed amended complaint states a claim for relief.[3]

A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. Id.

And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. Iqbal, 556 U.S. at 678. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief. Iqbal, 556 U.S. at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. Id. The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. See Twombly, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. Id. at 556.

---

[3] On a motion for leave to amend the complaint, the Court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). But the Court has discretion to deny leave when amendment would be futile, such as when the allegations of the amended complaint nonetheless fails to state a claim. See, Gandhi v. Sitara Capital Management, LLC, 721 F.3d 865, 868–69 (7th Cir. 2013); Hintz v. JPMorgan Chase Bank, N.A., 686 F.3d 505, 511 (8th Cir. 2012). Thus, in this case the Court reviews the motion for leave to amend under the same standard as a motion to dismiss for failure to state a claim.

## III. ANALYSIS

The Court first takes a moment to sort through the claims in Bussing's operative complaint, which asserts twelve theories of recovery, with each brought against all of the defendants (unless otherwise noted). Those theories are: retaliation in violation of 15 U.S.C. § 78u–6(h), the whistleblower-protection provision of the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank");[4] retaliation in violation of Neb. Rev. Stat. § 48-1114(3) of the Nebraska Fair Employment Practices Act (FEPA), Neb. Rev. Stat. § 48-1101 *et seq.*; wrongful termination in violation of public policy; breach of contract; breach of the covenant of good faith and fair dealing (against Legent only); defamation; fraudulent inducement, misrepresentation, and concealment; negligent misrepresentation; tortious interference with a business relationship or expectancy; and negligence.

The Magistrate Judge first found that Bussing failed to state a claim under Dodd-Frank. Filing 70 at 6–16. Bussing has objected to this finding, and as explained below, this Court finds that Bussing has, in fact, stated a claim for relief under Dodd-Frank. Filing 76.

The Magistrate Judge also found that Bussing had failed to state claims for defamation and for fraudulent inducement, fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation, and that her proposed amendment, as to those claims, was thus futile. Filing 70 at 21–25. Bussing has not objected to this aspect of the Magistrate Judge's findings. The Court therefore adopts those findings: those claims are dismissed and leave to amend is denied.

The defendants have not challenged Bussing's claims for breach of contract and breach of the covenant of good faith and fair dealing. Accordingly, those claims may proceed. The defendants have objected to the Magistrate Judge's finding that Bussing had successfully pleaded claims for wrongful termination in violation of public policy and under FEPA. Filing 74. The resolution of those claims is detailed below; for now it suffices to say that they will be allowed to proceed.

Next, the Magistrate Judge found that Bussing had stated claims for tortious interference against the individual defendants, but not the corporate defendants. Bussing has objected to the latter finding. Filing 76. The Court finds that Bussing's tortious interference claims require a close examination of potentially complex legal questions that the parties have not yet briefed. The claims will be allowed to proceed, subject to reevaluation at a later time.

Finally, the Magistrate Judge found that Bussing had failed to state a claim for negligence against the individual defendants, but that she had stated

---

[4] Pub. L. No. 111–203, 124 Stat. 1376 (2010) (codified in various sections of Titles 7, 12, and 15 U.S.C.).

a claim for negligence against COR and Legent, based upon their alleged failure to properly report certain information to the IRS. Filing 70 at 26–27. Neither party has objected to either aspect of this finding, and so the Court adopts the Magistrate Judge's recommendation without modification.

Before turning to the merits of Bussing's claim under Dodd-Frank, one additional procedural matter bears noting: Bussing's Motion to Offer Additional Evidence (filing 78) will be denied as moot. The Court has considered the proffered evidence, and it has not factored meaningfully into the Court's analysis.

## A. DODD-FRANK WHISTLEBLOWER CLAIM

Bussing's first claim arises under 15 U.S.C. § 78u–6(h), a provision of Dodd-Frank that protects employees from retaliation for certain whistleblowing activities and disclosures. The parties dispute both whether Bussing qualifies as a whistleblower under Dodd-Frank and whether Dodd-Frank protects Bussing's disclosures related to the Rule 8210 document request. Each side claims that its position is supported by the language of the statute. Bussing also argues that the Court should defer to the SEC's construction of the statute, as set forth in regulations recently adopted by the SEC.[5] After carefully reviewing the statute and the relevant caselaw, the Magistrate Judge found that Bussing did not qualify as a Dodd-Frank whistleblower. Filing 70 at 7–16. Bussing has objected to this finding, and the Court has conducted its own de novo review of the matter. For the reasons discussed below, this Court reads the statute differently than the Magistrate Judge, and finds that on the facts alleged, Bussing qualifies as a Dodd-Frank whistleblower, and further finds that she has made disclosures protected by Dodd-Frank's anti-retaliation provision.[6]

### 1. Bussing Qualifies as a "Whistleblower" Under Dodd-Frank

Dodd-Frank amended the Securities and Exchange Act of 1934, 48 Stat. 881, *as amended*, 15 U.S.C. § 78a *et seq*., to provide incentives for whistleblowers to report to the SEC in the form of a "bounty" program, through which whistleblowers may receive financial awards from the SEC for providing the SEC with original information relating to violation of the securities laws. 15 U.S.C. § 78u-6(b)–(g). Dodd-Frank also created a private cause of action for

---

[5] *See* 17 C.F.R. § 240.21F–2(b)(1).

[6] One final procedural matter must be addressed. In addition to the extensive briefs submitted by the parties, Bussing has provided the Court with an amicus brief submitted by the SEC in a case pending before the Court of Appeals for the Second Circuit. *See Meng-Lin Liu v. Siemens A.G.*, 2013 WL 5692504 (S.D.N.Y. Oct. 21, 2013), *appeal docketed*, No. 13-4385 (2d Cir. Nov. 14, 2013). Filing 85. The Court has considered this brief, as well as an appellate brief submitted by the defendant in the *Liu* case, which was provided (along with additional briefing of their own) by the defendants in this case. *See*, filings 90, 91, and 92.

certain individuals whose employers retaliate against them for taking certain protected actions. 15 U.S.C. § 78u-6(h). This case centers around the anti-retaliation provision, which provides:

> No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower–
>
>> (i) in providing information to the Commission in accordance with this section;
>>
>> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>>
>> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j-1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u-6(h)(1)(A).

The first two subsections, (i) and (ii), protect whistleblowers who report to the SEC or work directly with the SEC in some manner. *See Nollner v. S. Baptist Convention, Inc.*, 852 F. Supp. 2d 986, 993 (M.D. Tenn. 2012). "By contrast, the third category does not require that the whistleblower have interacted directly with the SEC—only that the disclosure, to whomever made, was 'required or protected' by certain laws within the SEC's jurisdiction." *Id.* In fact, as the Court explains below, the language of subsection (iii) covers a broad array of disclosures to entities other than the SEC.

Bussing has not alleged that she provided any information to the SEC; thus, she seeks relief under subsection (iii). She argues that by complying with the Rule 8210 document request, cooperating with FINRA's examination and investigation, and preparing a report regarding Bank Secrecy Act and anti-money laundering violations, she made disclosures that were required by a rule subject to the jurisdiction of the SEC—FINRA Rule 8210—and thus made disclosures protected by subsection (iii). As the Court explains below, and despite defendants' arguments to the contrary, FINRA Rule 8210 does qualify as a rule subject to the jurisdiction of the SEC, and Bussing has properly pleaded that she made a disclosure required by that rule. If that were the end of

- 8 -

the matter, Bussing's claim would fall easily within subsection (iii). But there is a more basic, definitional issue the Court must first address.

By its terms, the anti-retaliation provision of Dodd-Frank only extends protection to "whistleblowers." The introductory paragraph provides that no employer shall take retaliatory acts against "a <u>whistleblower</u> in the terms and conditions of employment because of any lawful [enumerated] act done by the <u>whistleblower</u>." 15 U.S.C. § 78u-6(h)(1)(A) (emphasis supplied). And the term "whistleblower" is defined, in a separate subsection of Dodd-Frank, as "any individual who provides, or 2 or more individuals acting jointly who provide, information relating to a violation of the securities laws <u>to the Commission</u>, in a manner established, by rule or regulation, by the Commission." 15 U.S.C. § 78u-6(a)(6) (emphasis supplied). The statute's definition of "whistleblower," which requires a disclosure to the SEC, therefore exists in tension with subsection (iii) of the anti-retaliation provision, which protects a broad range of disclosures to entities other than the SEC.

If, on the other hand, the anti-retaliation provision is read using the word "whistleblower" in its everyday sense, there is no such tension. In that sense, a whistleblower is "a person who tells police, reporters, etc., about something (such as a crime) that has been kept secret,"[7] or an "employee who reports employer wrongdoing to a governmental or law-enforcement agency."[8] If this reading of the term "whistleblower" is applied to the anti-retaliation provision— while maintaining the statutory definition for the other subsections, which deal solely with the bounty program—all parts of the statute fit together into a harmonious and coherent whole. *Cf. FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000). This interpretation gives effect to the full range of disclosures protected by the anti-retaliation provision, while reserving rewards under the bounty program for whistleblowers who report to the SEC.

"'Statutory definitions control the meaning of statutory words, of course, in the usual case. But this is an unusual case.'" *Nw. Austin Mun. Util. Dist. No. One v. Holder,* 557 U.S. 193, 206–07 (2009) (quoting *Lawson v. Suwannee Fruit & S.S. Co.,* 336 U.S. 198, 201 (1949)). When it is apparent that Congress intended a word to be given its ordinary meaning, notwithstanding the presence of a statutory definition to the contrary, and when applying the definition to the provision at issue would defeat that provision's purpose, the Court will not mechanically read the statutory definition into that provision. *See Philko Aviation, Inc. v. Shacket,* 462 U.S. 406, 411–12 (1983).

The Court is convinced that § 78u-6(h) presents just such an unusual case. Unless the term "whistleblower" is given its ordinary meaning for

---

[7] Merriam-Webster Online Dictionary, *s.v.* "Whistleblower", *available at* http://www.merriam-webster.com/dictionary/whistleblower (last accessed May 9, 2014).

[8] *Black's Law Dictionary* 1734 (9th ed. 2009).

purposes of this anti-retaliation provision, subsection (iii) will be rendered insignificant, and its purpose—to shield a broad range of employee disclosures—will be thwarted. To understand why, it is helpful to carefully examine the full extent of subsection (iii)'s reach.

Subsection (iii) operates by incorporation; it protects disclosures required or protected by other laws. Unlike the preceding subsections, it applies to disclosures that are completely unrelated to any tip to the SEC. And, most importantly, subsection (iii) applies to a vast array of situations where the applicable laws or regulations call for disclosure to entities other than the SEC—disclosures that would not qualify for protection if the statutory definition of "whistleblower" is applied. The full panoply of protected disclosures is too extensive to recite in detail; an examination of two portions will suffice.

First, subsection (iii) protects disclosures required or protected by the Sarbanes–Oxley Act of 2002, Pub. L. No. 107–204, 116 Stat. 745 (codified in scattered sections of titles 15 and 18) ("Sarbanes-Oxley"). This statute, in turn, protects a broad range of employee disclosures to persons or entities other than the SEC, including internal reports to company officials.[9]

Second, subsection (iii) contains a catch-all provision which protects any disclosures required or protected by any law, rule, or regulation subject to the jurisdiction of the SEC. Again, it would not be feasible (or particularly helpful) to attempt to list every regulation covered by this language—but even a brief sample will illustrate both its breadth and the extent to which it protects disclosures to entities other than the SEC. As the Court explains below, FINRA Rule 8210 is a rule "subject to the jurisdiction of the Commission." That rule, in turn, requires the disclosure of information related to any investigation authorized by FINRA's by-laws or rules.[10] And it mandates disclosure not to the SEC, but to FINRA.

In short, Congress drafted subsection (iii) with the aim of protecting a very broad range of disclosures, including many to persons or entities other than the SEC. This understanding of the subsection's function is confirmed by comparing it to subsections (i) and (ii). Those subsections explicitly require not only that there be information provided to the SEC, but subsection (i) only

---

[9] Specifically, § 806 of Sarbanes-Oxley protects employees of covered companies from retaliation for providing information or assistance in the investigation of any conduct the employee reasonably believes to constitute a violation of various anti-fraud statutes, or any rule or regulation of the SEC. 18 U.S.C. § 1514A(a)(1). And § 806 protects not only disclosures to the SEC, but also to any federal regulatory or law enforcement agency, or to any member or committee of Congress. Moreover, § 806 protects internal reports, made to any person with supervisory authority over the employee. 18 U.S.C. § 1514(a)(1)(A–C).

[10] FINRA Rule 8210(a)(1) (2010). This is the version of Rule 8210 that was in effect at the relevant time. The rule has since been amended, although those amendments do not affect this case. See FINRA Rule 8210 (2013).

applies to information provided "in accordance with this section," that is, tips under the bounty program. 15 U.S.C. § 78u-6(h)(1)(A)(i). And subsection (ii), while more broadly aimed at covering testimony or assistance, is still limited to investigations or proceedings "based upon or related to" the tip. 15 U.S.C. § 78u-6(h)(1)(A)(ii).

By contrast, subsection (iii) protects a broader category of actions—"disclosures"—and does not require any connection between the disclosure and a tip to the SEC or even the bounty program. The lack of such a connection makes sense, because the anti-retaliation provision was drafted to have effect independent of the bounty program. Otherwise, it simply doesn't make sense that subsection (iii) would explicitly apply to an extensive range of disclosures to entities other than the SEC—disclosures that would *never* fall under the bounty program.[11]

When the term "whistleblower" is given its ordinary meaning—for purposes of the retaliation section only—everything falls into place. The broad protections of subsection (iii) are given effect, while rewards under the bounty program are properly limited to whistleblowers who provide tips to the SEC. But the same is not true under the contrary interpretation. When "whistleblower" is used in its narrower sense, subsection (iii) serves no significant purpose, and its aim of broadly protecting whistleblowers is stifled. This is best illustrated by examining a case that embraced that approach, *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 625 (5th Cir. 2013). However, before moving on, it will be helpful to take a brief detour into the history of the drafting of subsection (iii). The Court observes that nothing in the legislative history suggests that Congress anticipated any conflict between subsection (iii) and the definition of "whistleblower."

### (a) The Drafting of Dodd-Frank

Dodd-Frank was "a direct and comprehensive response to the financial crisis that nearly crippled the U.S. economy beginning in 2008." S. REP. 111-176, at 2 (2010). The primary purpose of Dodd-Frank was "to promote the financial stability of the United States . . . . through multiple measures designed to improve accountability, resiliency, and transparency in the financial system." *Id.* The whistleblower provisions were just one of those measures, and were a small part of a very large piece of legislation. *See* Dodd-Frank Act, Pub. L. 111-203, Title IX, § 922(a), 124 Stat. 1841 (2010). So, it is not surprising that the legislative history contains scant references to what would become § 78u-6. What discussion there was tended to focus on the bounty

---

[11] And even under subsections (i) and (ii), there is no requirement that a tip actually meet the qualifications for an award; nor even that such information, or testimony or assistance, result in a successful enforcement action. *See, e.g.,* 15 U.S.C. § 78u-6(a)(1) and (3), (b), and (c).

program; and the official record contains only fleeting references to the anti-retaliation provision.

The evolution of the bill's language likewise sheds little light on the matter. The bill introduced and eventually passed by the House contained a bounty program and an anti-retaliation provision that roughly resemble the enacted law. *See*, Wall Street Reform and Consumer Protection Act of 2009, H.R. 4173, 111th Cong. § 7203 (as introduced in House, Dec. 2, 2009) and (as passed by House, Dec. 11, 2009). Like the enacted law, that bill defined the term "whistleblower" to include only individuals who submit information to the SEC. *Id.* at § 7203(j)(4). But the anti-retaliation provision did not use the term "whistleblower" to describe the individuals protected from retaliation; instead, it used the phrase "employee, contractor, or agent." *Id.* at § 7203(g)(1)(A). And the anti-retaliation provision only protected conduct that would later become subsections (i) and (ii)—providing tips to the SEC or assisting in a resulting investigation or proceeding. *Id.* In other words, there was no equivalent to subsection (iii).

When the bill passed the Senate, the phrase "employee, contractor, or agent" in the anti-retaliation provision was replaced with "whistleblower." Restoring American Financial Stability Act of 2010, H.R. 4173, 111th Cong. § 922(h)(1)(A) (May 20, 2010). However, while the Senate version was essentially identical to the enacted version, it still lacked an equivalent to subsection (iii). In other words, there was no reason to anticipate that any conflict would arise from the replacement of the phrase "employee, contractor, or agent" with the term "whistleblower."

What would become subsection (iii) was added late in the legislative process. It first appeared in a draft of the conference committee base text that was used to finalize the legislation. There is nothing to suggest when or why the language was first added to that draft. Ultimately, the legislative history suggests that Congress was not aware of any potential conflict. So, with little guidance from the legislative history, the Court returns to the text of the statute. The Court is thus left to choose between one of two interpretations. There is the reading discussed above, which harmonizes all parts of the statute and gives subsection (iii) a meaningful purpose. But that is not the only way to read the statute; an alternative interpretation was suggested in *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 625 (5th Cir. 2013), to which the Court now turns.

### (b) The *Asadi* Approach

The Fifth Circuit found that subsection (iii) could be salvaged, even if it is read to apply only to individuals who qualify as whistleblowers under the statutory definition. *Asadi,* 720 F.3d at 625–29; *accord*, *Banko v. Apple Inc.*, 2013 WL 7394596 (N.D. Cal. Sept. 27, 2013); *Wagner v. Bank of Am. Corp.*,

2013 WL 3786643 (D. Colo. July 19, 2013). Specifically, the *Asadi* court decided that subsection (iii) serves to protect individuals who have already made a covered disclosure to the SEC, but who were retaliated against on the basis of another required or protected disclosure. *Id.* at 627. The Fifth Circuit provided a hypothetical to illustrate how this interpretation might work in practice:

> Assume a mid-level manager discovers a securities law violation. On the day he makes this discovery, he immediately reports this securities law violation (1) to his company's chief executive officer ("CEO") and (2) to the SEC. Unfortunately for the mid-level manager, the CEO, who is not yet aware of the disclosure to the SEC, immediately fires the mid-level manager. The mid-level manager, clearly a "whistleblower" as defined in Dodd–Frank because he provided information to the SEC relating to a securities law violation, would be unable to prove that he was retaliated against because of the report to the SEC. Accordingly, the first and second category of protected activity would not shield this whistleblower from retaliation. The third category of protected activity, however, protects the mid-level manager. In this scenario, the internal disclosure to the CEO, a person with supervisory authority over the mid-level manager, is protected under [§ 806 of Sarbanes-Oxley]. Accordingly, even though the CEO was not aware of the report to the SEC at the time he terminated the mid-level manager, the mid-level manager can state a claim under the Dodd–Frank whistleblower-protection provision because he was a "whistleblower" and suffered retaliation based on his disclosure to the CEO, which was protected under [Sarbanes-Oxley].

*Id.* at 627–28. The Magistrate Judge concurred with the analysis in *Asadi*. However, this Court respectfully disagrees, and is not persuaded by the reasoning of the *Asadi* court. Rather than demonstrating the reasonableness of its interpretation, this hypothetical exposes the *Asadi* court's interpretation as unwieldy.

In the whistleblower context, there are three major players: employee-whistleblowers, employers, and the SEC. And from the perspective of each, the *Asadi* interpretation poses problems. From the employer's perspective, this interpretation creates a peculiar standard of liability, in which liability for retaliation only attaches if certain preconditions—of which they are unaware—are satisfied. More importantly, the *Asadi* interpretation is simultaneously under-inclusive from the employee's perspective and over-inclusive from the SEC's point of view. That is because it fails to account for the fact that employees tend to report matters internally *before* complaining to the SEC.

- 13 -

Even after the passage of Dodd-Frank, there are many reasons an employee might not report first to the SEC. Many whistleblowers are not motivated by financial gain, and so the bounty program simply may not factor into their decision. Some employees may be driven by loyalty (misplaced or not) to give their companies a chance to remedy violations before calling in the SEC. And there are no doubt others who are simply not savvy enough to know that they should take the counter-intuitive step of first reporting to the SEC if they want any protection for internal reporting.

Thus, under *Asadi*, not only does the law fail to protect the majority of whistleblowers, it fails to protect those who are most vulnerable to retaliation. Nor can the *Asadi* court's narrow construction be squared with the broad sweep of disclosures protected by subsection (iii). This Court will not attribute to Congress an intent to offer a broad array of protections with one hand, only to snatch it back with the other, leaving behind protection for only a narrow subset of whistleblowers.

Nor is it logical to conclude that Congress intended to encourage an across-the-board departure from the general practice of first making an internal report. Internal reporting serves a number of important interests—shared by employers and the SEC. It allows companies to remedy improper conduct at an early stage, perhaps before it rises to the level of a violation. SEC, *Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300–01, 2011 WL 2293084, at *34324 (August 12, 2011). Requiring employees to report first to the SEC would also risk frustrating companies' internal compliance programs, and could deter whistleblowers from participating in internal investigations. *Id.*

Internal reporting may also prevent simple misunderstandings—where an employee is mistaken, and there has been no legal violation—from transforming into investigations that waste corporate and government resources. *Id.* In other words, it will help vet the tips to the SEC, so that the SEC receives fewer and higher quality reports from whistleblowers. *Id.* Thus, from the SEC's perspective, the *Asadi* interpretation is over-inclusive, as it encourages reports to the SEC that could be more efficiently handled internally, thus wasting government resources generally and diverting resources from cases that need the SEC's full attention. There will of course be situations where an employee knows that an internal report would be futile, or where there has been a clear and ongoing violation of the securities laws that calls for the SEC's intervention. And some whistleblowers might simply want some of that bounty money. Accordingly, nothing in the law *requires* an internal disclosure before reporting to the SEC. After all, Congress aimed to encourage whistleblowers to report to the SEC. But it does not follow that Congress intended to *discourage* internal reporting.

This Court's reading of the statute is not only faithful to the text of the statute, but it also gives meaningful effect to all of its parts, and furthers the purposes underlying Dodd-Frank. As a practical matter, this interpretation reaches the same result as the SEC's regulation.[12] But the result flows from the statute itself, and it is not necessary to determine if deference to the SEC's construction of the statute is warranted.[13]

### 2. Disclosures Required by a Rule Subject to SEC's Jurisdiction

The Court further finds that Bussing has properly alleged that she made a disclosure required by a rule or regulation subject to the jurisdiction of the SEC: FINRA Rule 8210. That rule provides that, for purposes of a FINRA investigation or proceeding, FINRA staff may require a member company (i.e., Legent), or any person associated with a member or otherwise subject to FINRA's jurisdiction "to provide information orally, in writing, or electronically . . . with respect to any matter involved in the investigation, complaint, examination, or proceeding." FINRA Rule 8210(a)(1) (2010). The rule also gives FINRA staff the right to inspect and copy the books, records, and accounts of any such member or person with respect to any matter involved in the investigation or proceeding. FINRA Rule 8210(a)(2). In case there was any doubt that disclosure is mandatory, the rule further states that "[n]o member or person shall fail to provide information or testimony or to permit an inspection and copying of books, records, or accounts pursuant to this Rule." FINRA Rule 8210(c). The terms of Rule 8210 are clear and mandatory; thus, Bussing has alleged that her disclosures were required by rule or regulation.

The defendants argue that while Bussing may have complied with the Rule 8210 document request, she has not actually alleged that she made any "disclosure." Filing 66 at 11–12. Instead, they claim, Bussing has merely alleged that she "'participated'" in FINRA's onsite examination of Legent and that FINRA "'examined Legent's response to the Rule 8210 Document Request.'" Filing 66 at 11 (quoting filing 63-1 at ¶ 66). But it was Bussing who prepared Legent's response, which was then provided (i.e., disclosed) to FINRA. Filing 63-1 at ¶ 60. And Bussing claims that she did so despite directions from Salas

---

[12] 17 C.F.R. § 240.21F–2(b)(1); *see also* SEC, *Securities Whistleblower Incentives and Protections*, 76 Fed. Reg. 34300–01 at 34304.

[13] Some courts have held that the tension between the statute's definition of "whistleblower" and the scope of conduct protected by subsection (iii) renders the statute ambiguous, such that deference to the SEC's regulation is appropriate under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See, e.g.*, *Murray v. UBS Sec., LLC*, 2013 WL 2190084, at *2–7 (S.D.N.Y. May 21, 2013); *Kramer*, 2012 WL 4444820 at *4–5; *see also Rosenblum v. Thomson Reuters (Markets) LLC*, 2013 WL 5780775, at *3–5 (S.D.N.Y. Oct. 25, 2013). However, this Court's reading of the statute, in context, offers a more direct resolution of this tension.

and Sime, who allegedly told her to ignore or respond incompletely to the Rule 8210 document request. Filing 63-1 at ¶¶ 56–59. This shows not only that Bussing was personally responsible for the disclosure to FINRA, but that she did so in a classic whistleblowing context.

The defendants also argue that Dodd-Frank should not be interpreted "so broadly as to protect individuals who simply gather documentation for FINRA to inspect without that individual affirmatively disclosing information specific to a particular violation." Filing 66 at 12. But § 78u-6(h)(1)(A)(iii) broadly protects disclosures required by law; it does not require the disclosure to relate to a particular violation. And even if it did, Bussing has alleged that in the response she prepared, she identified several potential or existing violations of FINRA rules and federal securities laws, including violations of the Bank Secrecy Act and anti-money laundering provisions. Filing 63-1 at ¶ 50.

Finally, the Court finds that FINRA Rule 8210 is a rule subject to the jurisdiction of the SEC. To speak of the SEC's "jurisdiction" is simply to refer to the scope of its regulatory authority, which is, in turn, a question of the agency's authority under the relevant statute. *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1866, 1868 (2013). As a national securities association, FINRA is undoubtedly subject to the SEC's jurisdiction. FINRA "creates and enforces rules that govern the industry alongside the SEC and is subject to significant SEC oversight." *Aslin,* 704 F.3d at 476. The SEC must approve all of FINRA's rules, and may abrogate, add to, and delete from all FINRA rules as it deems necessary. *Id.* (citing 15 U.S.C. § 78s(b)(1) and (c)). And Rule 8210 is no exception.[14] *See, e.g.,* FINRA, *13-06 SEC Approves Amendments to Rule 8210* (Feb. 25, 2013).

Thus, the Court finds that Bussing has stated a claim for relief under § 78u-6(h)(1)(A)(iii). The Court will sustain Bussing's objection, and declines to adopt this portion of the Magistrate Judge's findings and recommendation. Bussing's Dodd-Frank claim will be allowed to proceed.

### B. Bussing's Claims Under FEPA and Neb. Rev. Stat. § 20-148

Bussing's next claim for relief arises under Nebraska's Fair Employment Practices Act (FEPA). Specifically, Bussing relies upon Neb. Rev. Stat. § 48-1114(3), which prohibits employers from discriminating against any employee because he or she has "has opposed any practice or refused to carry out any action unlawful under <u>federal law</u> or the laws of this state." (Emphasis supplied.) The defendants do not dispute the Magistrate Judge's finding that Bussing has alleged she engaged in protected activity under § 48-1114(3), i.e., "complying with the Rule 8210 document request, cooperating in the FINRA

---

[14] Given this finding, the Court does not reach Bussing's alternative (and brief) argument that she made a disclosure required by a separate provision, FINRA Rule 3310. Filing 67 at 13.

exam . . ., issuing directives to cease processing penny stock certificates, and preparing her internal report regarding the violations of the Bank [Security] Act and anti-money laundering violations." Filing 70 at 20.

Instead, the defendants attack the procedural route that Bussing has taken. FEPA requires plaintiffs to exhaust certain administrative remedies with the Nebraska Equal Opportunity Commission (NEOC) before filing suit. *See Goolsby v. Anderson*, 549 N.W.2d 153, 156–57 (Neb. 1996). But Bussing has taken an alternative route: Neb. Rev. Stat. § 20-148. That statute "provides a procedural avenue for pursuit of certain employment-related claims without exhausting the available administrative remedies." *Dossett v. First State Bank, Loomis, Nebraska*, 627 N.W.2d 131, 137 (Neb. 2001). "Section 20-148 was enacted to provide an alternative remedy for plaintiffs who otherwise would be trapped in bureaucratic backlogs." *Goolsby*, 549 N.W.2d at 157. The statute allows a plaintiff to bring suit based upon the "deprivation of any rights, privileges, or immunities secured by the United States Constitution or the Constitution and laws of the State of Nebraska." Neb. Rev. Stat. § 20-148(1).

The defendants argue that § 20-148 is only available to plaintiffs alleging violations of their civil rights, and that Bussing's claim, predicated on violations of federal securities and banking laws, does not suffice. This argument is not persuasive. Section 20-148 expressly applies to any rights secured by the "laws of the State of Nebraska." Not only is § 48-1114(3) such a law, but *Goolsby* expressly held that claims based upon FEPA were cognizable under § 20-148. *See Goolsby*, 549 N.W.2d at 157–58.

The defendants also claim that it is "inconceivable" that the Nebraska Legislature could have intended that § 20-148 would be used to pursue a claim under § 48-1114(3), as § 20-148's enactment preceded the creation of the protections found in § 48-1114(3). Filing 75 at 5. Essentially, the defendants argue that the rights that may be vindicated under § 20-148 are limited to those existing under Nebraska's statutes at the time § 20-148 was enacted. Again, the Court is not persuaded. It is true that § 20-148 is a "procedural statute which does not create any new substantive rights." *Goolsby*, 549 N.W.2d at 157. But that does not mean that the Legislature tied its own hands in enacting § 20-148, and forever barred itself from creating substantive rights that fall within its scope. Thus, as to Bussing's FEPA claims, brought via § 20-148, the Court overrules the defendants' objection, accepts the Magistrate Judge's recommendation, and finds that Bussing has stated a claim for relief.

## C. WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

Bussing has asserted a Nebraska tort claim for wrongful termination in violation of public policy. In Nebraska, unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. *Coffey v.*

*Planet Group, Inc.*, 287 Neb. 834, 844, --- N.W.2d ---- (Neb. 2014). There is, however, a public policy exception to the at-will employment doctrine. *Id.* Under this exception, an employee can bring a common law tort claim for wrongful discharge when the motivation for the firing contravenes public policy. *Id.* However, the public policy exception is restricted to cases when a clear mandate of public policy has been violated, and it should be limited to manageable and clear standards. *Id.* In determining whether a clear mandate of public policy is violated, the Court asks whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. *Id.*

Bussing argues that such a clear mandate is present in the whistleblower protections of Dodd-Frank.[15] The Magistrate Judge found that this was sufficient and allowed the claim to proceed. Filing 70 at 21. The defendants object, raising a number of counter-arguments. But the defendants' basic contention is that federal securities and banking law do not amount to an expression of Nebraska's *state* public policy.

At this point, the Court finds the parties' dispute to be purely theoretical. The Court will assume, for the time being, that a federal law can provide the source of public policy for a state tort claim. Bussing asks the Court to find support for a wrongful discharge claim on the policy expressed by Congress in Dodd-Frank. Very well. Congress has declared that it violates public policy when whistleblowers are fired in retaliation for conduct covered in § 78u-6(h)(1)(A). If Dodd-Frank is the source of Bussing's common law claim, then for all practical purposes, her wrongful discharge claim is perfectly co-extensive with her statutory Dodd-Frank claim. The Court cannot alter Congress' expression of public policy—the Nebraska Supreme Court has been clear that a court cannot contradict the Legislature on matters of public policy. *E.g.*, *Amen v. Astrue*, 822 N.W.2d 419, 423 (Neb. 2012). Bussing has not suggested that there is any difference between these claims—she does not point the Court to any conduct protected by the broad policy of protecting whistleblowers that is not actually covered in her Dodd-Frank claim. Nor does she claim that Dodd-Frank is somehow inadequate in its remedies.

Thus, at this time, the Court need not determine if Bussing has pleaded a separate claim for wrongful discharge in violation of public policy. If such a claim exists, it is—for present purposes—virtually the same as her Dodd-Frank

---

[15] Bussing also argues that this policy is expressed in FEPA, through its inclusion of protections for employees who oppose or refuse to participate in violations of federal law. Neb. Rev. Stat. § 48-1114(3). Assuming that this statute could provide a sufficiently clear and definite expression of Legislative intent, it does not add anything to the analysis. The policy expressed in that statute is essentially "look to federal law." The Court has done so, and Bussing has not persuasively explained how FEPA adds anything of substance to the Court's analysis.

claim. So, the claim may proceed for the time being. The defendants' objection is therefore denied.

### D. TORTIOUS INTERFERENCE

The Court turns finally to Bussing's claim for tortious interference with a business relationship or expectancy. Filing 63-1 at ¶¶ 135–39. To state a claim for relief, Bussing must allege facts to support the following elements: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damages. *Huff v. Swartz*, 606 N.W.2d 461, 466 (Neb. 2000).

Bussing alleges generally that she had valid business relationships or expectancies with both Legent and COR. Filing 63-1 at ¶ 136. She claims that the defendants interfered with those relationships by terminating her in retaliation for her anti-money laundering audits of Legent and her response to the Rule 8210 document request. More specifically, she claims that the individual defendants interfered with her relationships with both Legent and COR, and that Legent and COR interfered with her relationship with each other. *See* filing 67 at 26.

The Court begins with a basic observation. A tortious interference claim requires a third party; a contracting party cannot be held liable in tort for interfering with its own contract. *Huff*, 606 N.W.3d at 467 (citing *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991)). Thus, Bussing does not argue that Legent or COR interfered with its own relationship with her. For that, Bussing has sought recourse through other means, such as her retaliation and breach of contract claims. When the party alleged to have interfered is a supervisor or coemployee, matters become more complicated.

Generally speaking, the agent of a principal cannot be held liable for interfering with a contract between the principal and a third party. *See, e.g.*, *Martin v. Johnson*, 975 P.2d 889, 896 (Okla. 1998). A corporation can only act through its directors, officers, and agents. *Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig*, 529 N.W.2d 33, 40 (Neb. 1995). It follows that if a corporation's agent is acting within the scope of his authority, his acts are acts of the corporation and there is only one actor. *Id.* Thus the question becomes, at what point does the coemployee become a "third person" subject to liability for tortious interference with the employment relationship of another on the basis of an unjustified intentional act? *Huff*, 606 N.W.3d at 467. In *Huff*, the Nebraska Supreme Court sketched the outlines of an answer.

First, whether conduct amounts to interference by a third party is a separate inquiry from whether the conduct was unjustified. *Id.* In determining whether a defendant was a third party capable of interfering, courts draw a

- 19 -

distinction between actions which fall within the general scope of the alleged interferer's authority as an agent of the employer and those which are in furtherance of some individual or private purpose not related to the interests of the employer. *Id.*

> If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort. To allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation.

*Id.* (quoting *Nordling*, 478 N.W.2d at 505–06). Stated differently, so long as the officer "'acts within the general range of his authority intended to benefit the corporation, the law identifies his actions with the corporation.'" *Id.* (quoting *Hickman v. Winston County Hosp. Bd.,* 508 So.2d 237, 239 (Ala. 1987)). In another formulation of the rule, the plaintiff must show that the coemployee "was serving a master other than the employer or was pursuing 'some benefit to himself, at odds with the interests' of the employer." *Id.* at 467–68 (quoting *Wilcox v. Niagara of Wisconsin Paper Corp.,* 965 F.2d 355, 365 (7th Cir. 1992)). Synthesizing these statements, the *Huff* court held that "in order to constitute actionable interference with an employment relationship, actions of a coemployee must be shown to have been committed in furtherance of some purpose other than the <u>lawful purposes</u> of the employer." *Id.* at 468 (emphasis supplied).

The Magistrate Judge found that as to the individual defendants, Bussing had sufficiently pleaded a claim for relief.

> The allegations state that Bussing was terminated from her employment for not following the instruction of the individual defendants to "stall, delay, stop digging and stop responding" to the FINRA investigation and for refusing to discontinue her audit work uncovering potential anti-money laundering compliance issues. Taken as true for the purposes of this motion, the court does not believe avoiding regulatory compliance and covering up potential money laundering violations falls within the lawful purposes of the employer, and the individual defendants' command that Plaintiff commit these acts could be considered an intentional effort to interfere with Bussing's relationship with COR and Legent.

Filing 70 at 26.

But the Magistrate Judge went on to find that Bussing's proposed complaint failed to plead facts discussing how the corporate defendants were alleged to have carried out acts of interference specifically directed at Bussing's relationship or expectancy with the other organization. *Id.* The Magistrate Judge therefore found that the proposed amendment would be futile, and recommended denial of the motion to amend with respect to adding a claim of tortious interference against the corporate defendants. Bussing has objected to the Magistrate Judge's finding with respect to the corporate defendants. Filing 76. The defendants have not objected to the Magistrate Judge's finding with respect to the individual defendants.

In reviewing Bussing's objections, the Court has noted several potential complications, not yet addressed by the parties. As such, it is easier to start from scratch. To begin with, it is not clear whether Bussing has stated a claim for any interference with her relationship with COR for a simple reason: Bussing's operative complaint does not explain what, if any, ongoing relationship she had with COR. Bussing worked as an independent contractor for COR from September to December 2011. Filing 63-1 at ¶ 15. On January 1, 2012, she accepted employment with Legent. Filing 63-1 at ¶ 28. Bussing has not alleged that she was still employed by COR after that point. Nor does her complaint make clear what business relationship or expectancy she might have maintained with COR. Simply alleging that she "had valid business relationships or expectancies" with COR is not enough. Filing 63-1 at ¶ 136. A complaint must do more than recite the elements of a tortious interference claim. *See Twombly*, 550 U.S. at 555. Bussing must allege "facts that show some protectable right—a prospective economic or contractual relationship. Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some 'reasonable expectation of economic advantage.'" *Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 37 (N.J. 1989) (quoting *Harris v. Perl*, 197 A.2d 359, 363 (N.J. 1964)). That said, it may very well be that Bussing had an existing or prospective relationship with COR. Therefore, she will be given leave to replead her claim.

For now, the Court will focus on Bussing's relationship with Legent, with whom Bussing has alleged an ongoing business relationship, as expressed in her employment agreement with Legent. With regard to that relationship, there are four categories of potentially interfering defendants: (1) Sime, who was an officer of Legent (but not COR); (2) Sugarman, who was a director of COR (but not Legent); (3) COR itself; and (4) Frankel who was CEO of Legent and a director of COR, and Salas, who was a director of COR and (after May 4, 2012) an officer of Legent. *See* filing 63-1 at ¶¶ 5–8, 68, 70.

The Court begins with Sime. Because Sime worked for Legent, he was a coemployee for purposes of *Huff*. As noted above, the Magistrate Judge found

that, with respect to all of the individual defendants, "avoiding regulatory compliance and covering up potential money laundering violations" did not fall within the lawful purposes of their employers. Filing 70 at 26.

While Bussing has alleged that Sime acted with an unlawful purpose, it was apparently a purpose that Sime shared with Legent. Both were interested in covering up Legent's alleged misconduct. Bussing does not allege that Sime acted outside the scope of his employment, or in order to benefit himself at Legent's expense. *Huff* did not address whether liability for tortious interference may attach when the unlawful purpose is shared by the corporation and the co-employee. Because the parties have not briefed this issue, the Court will not proceed without offering both sides a chance to weigh in. So, at this time, Bussing's complaint against Sime will be allowed to proceed.

Bussing's claims against COR potentially raise another complication not yet addressed by the parties. Legent is COR's wholly-owned subsidiary. Filing 63-1 at ¶ 4. Courts from other jurisdictions have held that a parent corporation has a qualified privilege to interfere with the contractual relations of its subsidiary. *See, e.g.*, *Waste Conversion Systems, Inc. v. Greenstone Industries, Inc.*, 33 S.W.3d 779, 781 (Tenn. 2000); *T.P. Leasing Corp. v. Baker Leasing Corp.*, 732 S.W.2d 480, 483 (Ark. 1987). The contours of this privilege, as it might exist under Nebraska law, are not yet clear. This, in turn, could affect Bussing's claims against the remaining individual defendants, depending upon whether they were acting within their capacities as employees of COR and/or Legent. Again, because the parties have not addressed this issue, the Court finds it inappropriate to proceed without allowing them an opportunity to brief the matter.

For the time being, Bussing's tortious interference claims will be allowed to proceed. However, the parties will need to address the issues identified above. Because the Court reaches this decision on different grounds than the Magistrate Judge, the Court declines to adopt the corresponding portion of the Findings and Recommendation. Bussing's objection is therefore denied as moot.

THEREFORE, IT IS ORDERED:

1.  The defendants' objections (filing 74) are overruled.

2.  Bussing's objections (filing 76) are sustained in part and overruled as moot in part, as set forth above.

3.  The Magistrate Judge's Findings and Recommendation (filing 70) are adopted in part and declined in part, as set forth above.

4.   The defendants' motion to dismiss (filing 26) and Bussing's motion for leave to file a third amended complaint (filing 63) are both granted in part and denied in part, as set forth above. Specifically,

    a.   Bussing's claims for retaliation under Dodd-Frank, discrimination under FEPA, wrongful termination in violation of public policy, breach of contract, breach of the covenant of good faith and fair dealing, tortious interference, and negligence (against COR and Legent only, for their alleged failure to properly report information to the IRS) may proceed; and

    b.   Bussing's remaining claim for defamation is dismissed. As to that claim and the remaining claims sought to be added in her proposed amended complaint (fraudulent and negligent misrepresentation, fraudulent inducement, and fraudulent concealment) her leave to amend is denied as futile.

5.   On or before June 11, 2014, Bussing shall file a new amended complaint that conforms to the findings of this Memorandum and Order.

6.   Bussing's Motion to Offer Additional Evidence (filing 78) is denied as moot.

Dated this 21st day of May, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge