## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JULIE A. BUSSING, | ) | Case No. 8:12-CV-238-WKU-CRZ |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| COR CLEARING, LLC, | ) | **THIRD AMENDED** |
| f/k/a LEGENT CLEARING, LLC; | ) | **COMPLAINT** |
| COR SECURITIES HOLDINGS, INC.; | ) | **AND JURY DEMAND** |
| STEVEN A. SUGARMAN; CARLOS P. SALAS; | ) | |
| CHRISTOPHER L. FRANKEL; and | ) | |
| JEFFREY N. SIME, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Julie A. Bussing ("Plaintiff" or "Bussing"), by and through the undersigned counsel, for her Third Amended Complaint against Defendants COR Clearing, LLC f/k/a Legent Clearing, LLC ("Legent Clearing" or "Legent"); COR Securities Holdings, Inc. ("COR"); Steven A. Sugarman ("Sugarman"); Carlos P. Salas ("Salas"); Christopher L. Frankel ("Frankel"), and Jeffrey N. Sime ("Sime") (collectively, "Defendants") hereby states and alleges as follows:

### JURY DEMAND

Bussing hereby requests a jury trial of this matter to the fullest extent permissible under the law.

### PARTIES, JURISDICTION & VENUE

1.      Bussing is an individual who, at the time of the filing of the original Complaint herein, resided in Omaha, Nebraska, but was domiciled in and a citizen of Washington.

2.      Legent is a Delaware limited liability company that is authorized to and does business in Nebraska. Legent's principal place of business is in Omaha, Nebraska. At all relevant times, Legent was a broker/dealer under state and federal law registered with and

regulated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA").  At all relevant times, Legent operated and still operates as a "clearing" broker/dealer.

3.      COR is a Delaware corporation with a principal place of business in Santa Monica, California.

4.      Legent is a wholly-owned subsidiary of COR.

5.      Sugarman is an individual who resides in Pacific Palisades, California.  At all relevant times, Sugarman was an officer (Chief Executive Officer) and a director of COR.

6.      Salas is an individual who resides in Topanga, California.  At all relevant times, Salas was a director of COR.  Beginning on or about May 4, 2012, Salas has also served as an officer (Executive Vice President and/or President) of Legent.

7.      Frankel is an individual who resides in Tampa, Florida.  At all relevant times, he was an officer (Chief Executive Officer) of Legent and a director of COR.

8.      Sime is an individual who resides in Omaha, Nebraska.  At all relevant times, he was an officer (including Chief Operating Officer, Chief Financial Officer and other roles) of Legent.

9.      At various times throughout the period described herein, Sugarman, Salas, and Frankel have traveled to and worked from Legent's main office in Omaha, Nebraska.

10.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### Bussing's Background and Initial Relationship with Defendants

12.     Bussing holds a Bachelor of Science in Accounting from Portland State University and a Master of Business Administration from the University of Washington. Bussing was previously licensed as a Certified Public Accountant in Oregon and Washington and previously worked as a CPA at PricewaterhouseCoopers (formerly Coopers & Lybrand) as an auditor, management consultant, and tax accountant.

13.     Bussing has a comprehensive trading, clearing operations, finance, accounting, and compliance background at SEC- and FINRA-regulated firms.  She has worked in the securities industry since 1989 and held the positions of Chief Financial Officer, Vice President of Operations, Executive Vice President, President, Executive Representative, and the Designated Person Responsible for Establishing Compliance Policies and Procedures at broker-dealers registered with the SEC and FINRA.  Bussing has attended the New York Institute of Finance and has been duly qualified to hold the following FINRA securities licenses:

| | |
|---|---|
| Series 4 | Registered Options Principal |
| Series 7 | General Securities Representative |
| Series 24 | General Securities Principal |
| Series 27 | Financial and Operations Principal |
| Series 52 | Municipal Securities Representative |
| Series 53 | Municipal Securities Principal |
| Series 63 | Uniform Securities Agent State Law Examination |
| Series 65 | Uniform Investment Advisor Law Examination |

15.     Bussing worked for COR as an independent contractor pursuant to an informal consulting arrangement from September 19, 2011, to December 31, 2011.  Bussing's consulting duties included assisting with the due diligence for COR's acquisition of Legent and developing a Change of Control Plan for Legent.  During this period, Bussing was retained by and reported to Sugarman.

16.     The Change of Control Plan for Legent developed by Bussing included (but was not limited to) principles, goals, and plans such as: "halting" the firm's "troubling" regulatory history; instituting and maintaining a zero-tolerance policy for legal and compliance issues; focusing on "revenue generation, allocation/conservation of resources, exercising good judgment, risk management"; ending "adverse business dealings, onerous contractual commitments" and the like; closing or restructuring Legent's securities lending division (which was tied to a friend of Frankel's who had been barred from the securities industry); restoring profitability; and restructuring the company, leadership and staff to facilitate these purposes.

17.     The Change of Control Plan was approved by COR, Sugarman, Salas, and others for implementation immediately after the acquisition of Legent was completed, i.e., during the first six (6) months of 2012.

## Legent's Regulatory History

18.     Prior to Bussing's involvement with COR or Legent, Legent had been involved in several regulatory investigations and examinations.

19.     In 2009, 2010, and 2011, FINRA investigated and sanctioned Legent for various violations of FINRA rules and the federal securities laws, including but not limited to the Bank Secrecy Act ("BSA"), and anti-money laundering ("AML") provisions.

20.     FINRA's 2012 examination of Legent began in early January 2012 and involved examination of the same types of violations that had been found in 2009, 2010, and 2011, among other things.

21.     On or about April 23, 2012, formal proceedings were instituted by FINRA against Legent alleging that, as described on Legent's Central Registration Depository report maintained by FINRA:

    a.    "during an extended period of time encompassing 2009 and 2010 Legent Clearing LLC repeatedly and consistently failed to comply with various requirements of the Bank Secrecy Act (BSA), AML [anti-money laundering] and finacial [sic] reporting responsibilities resulting in violations of NSAD rules 2110, 3010, 3011, 3020; FINRA Rules 2010 and SEC Rules 15c3-1, 15c3-2, 17a-3 and 17a-5"; and

    b.    Legent "willfully violated Rules 15c3-1, 15c3-3, 17a-3, and 17a-5 of the Exchange Act of 1934, FINRA Rule 2010, NASD Rules 2110, 3010, 3011, 3011(b), 3020, 3110."

22.    According to Legent's Central Registration Depository report maintained by FINRA, among other allegations, Legent also:

    a.    "failed to design and implement a program that complied with various AML [anti-money laundering] rules geared toward detecting, preventing and/or reporting via a SAR [suspicious activity report] certain types of activity. In addition and according to the complaint, FINRA asserts that Legent failed to follow its own policies and procedures regarding AML [anti-money laundering]."

    b.    "failed to establish and implement policies and procedures that were reasonably designed to detect and cause the reporting of transactions required under the Bank Secrecy Act. The firm filed to implement a program to review the transactions of its introducing firms in order to adequately detect and then evaluate the presence of potential AML [anti-money laundering] red flags with a view towards determining whether the presence of the red flags required follow

up reporting.  The firm failed to implement procedures to ensure that its employees were aware of established criteria for identifying red flags that were reasonably designed to monitor for suspicious activity."

c.      "failed to establish procedures or implement a program that required, among others, the collection of sufficient and accurate information necessary to complete the SAR [suspicious activity report] form, adherence to the guidelines for completing and filing SARs, and the retention of source documentation for the subject of its filings, including the internal exception reports."

d.      "failed to implement procedures to ensure that timeframes and deadlines that were required by its written AML [anti-money laundering] program were being followed, including those for weekly AML [anti-money laundering] program reviews and risk assessment meetings."

e.      "untimely filed a foreign bank and financial accounts report (FBAR). The firm failed to establish adequate written procedures and internal controls regarding the reporting of FBARs and failed to accurately state in its written procedures that the filing requirement was for accounts in excess of $10,000 as required by the BSA [Bank Security Act]."

f.      "failed to prepare accurate customer reserve."

g.      "failed to properly classify securities in its custody or control."

h.      "failed to have written procedures for the solicitation and acceptance of checks from customers that were made payable to correspondents.  The firm failed to evidence that it had obtained or reviewed written procedures from any of its correspondents that were allowed to offer check writing privileges to

customers.  The firm did not maintain any records demonstrating that these check writing capabilities described above were included in the firm's due diligence, vetting and approval process of the correspondents."

i.      "failed to be in compliance with the SEC rule for net capital computations."

23.     Frankel, Sime, and most of the management team in place as of Legent's acquisition by COR had been employed by Legent during the time that these alleged violations occurred.

### Bussing's Initial Employment with Legent

24.     Beginning in November 2011 and continuing through the end of the year, Sugarman recruited Bussing to work for and lead Legent as its Executive Vice President ("EVP").

25.     Bussing initially declined to work for Legent based on the results of her due diligence investigation conducted in connection with COR's acquisition of Legent, including but not limited to the previous regulatory issues and potential current and continuing unethical and illegal practices and compliance violations.

26.     Sugarman, Legent, and COR (and their respective officers and directors) made assurances to Bussing to induce her to accept employment with Legent.  Key to these assurances was that Bussing was authorized to implement the Change of Control Plan and that Bussing and Legent would enter into a long-term employment agreement on certain terms.

27.     Bussing and Legent entered into a verbal employment agreement, negotiated and agreed by Sugarman, that included but was not limited to the following terms: $180,000 in annual base salary; bonus compensation that would be calculated based on Legent's

performance and profits at the end of each year; a three (3) year term of employment; Legent's

ability to terminate Bussing only for gross negligence; that Bussing would report directly to

Sugarman and the COR board of directors, and not to Frankel as Legent's CEO; that Frankel,

who was Legent's President during much of the firm's regulatory history, would be transitioned

out of Legent's management and leadership[1] within approximately six (6) months; and that at

that time, barring unforeseen events, Bussing would assume the duties of Legent's President.

28.     Based on assurances by Sugarman, Legent, and COR (and their respective

officers and directors), Bussing accepted employment as Legent's EVP and began working as

an employee of Legent on January 1, 2012.

29.     In connection with her employment with Legent, Bussing was acting within the

scope of some or all of her FINRA licenses, described above, and was regulated by and

accountable to FINRA on that basis as well as through her role with Legent.

30.     All of the terms of the verbal employment agreement were followed by all

parties after Bussing began employment with Legent.

31.     As soon as she began employment with Legent, Bussing began implementing the

Change of Control Plan, described above, with the express and implied approval of COR,

Sugarman, Salas, and others.

32.     As part of the Change of Control Plan implementation, Bussing restructured

Legent's securities lending division.  As it had been structured, more than 100% of the

division's profit was distributed to a friend of Frankel's who controlled the division, despite

having been barred from the securities industry.

---

[1] It is worth noting that although Frankel was Legent's President during much of the firm's regulatory history, and at one time his days with the firm were numbered, he remains President of Legent to date, more than two years after this matter was filed, and after the firm's December 2013 FINRA settlement and $1 million fine for compliance failures.  Similarly, Sime remains at the firm despite presiding over regulatory issues as CFO, COO, and President at various times.

33.     Legent became profitable within a few days after the beginning of Bussing's employment, and remained profitable throughout Bussing's employment with Legent.

34.     Legent's profitability was based in whole or in part on Bussing's work and implementation of the Change of Control Plan, including but not limited to restructuring Legent's securities lending division.  During Bussing's employment with Legent, no significant or effective measures or actions – other than Bussing's – were taken toward profitability.

35.     Upon information and belief, Legent remains profitable to date based in whole or in part on Bussing's work and implementation of the Change of Control Plan.

### FINRA examination and investigation

36.     On or about January 5, 2012, FINRA sent Legent a request for documents and information in conjunction with an examination.  FINRA began its examination-related field work on or about January 23, 2012, with a team of nine (9) FINRA examiners traveling to the Legent office in Omaha. The examination period was primarily focused on the reporting period of November 2011, with expanded scope to the 2011 calendar year in some areas.

37.     After the onsite fieldwork ended in February, FINRA continued sending large document and information requests throughout the early months of 2012, and escalated the examination and investigation in March.

38.     On or about April 4, 2012, FINRA sent a large document and information request and demanded a meeting at FINRA's office in New York on April 12, 2012, with Legent's Chief Compliance Officer ("CCO") and General Counsel.

39.     Prior to this request, Bussing had been recruiting a new CCO for Legent.  The new CCO was hired on April 5, 2012, and the former CCO was terminated on April 9, 2012. Bussing communicated this change to FINRA on behalf of Legent on April 9, 2012.

40.     On April 10, 2012, FINRA notified Legent of a special onsite audit to be conducted at Legent's Omaha office on April 16, 2012.  On April 13, 2012, FINRA notified Legent that it had indefinitely postponed the onsite examination.

41.     The document and information requests, exams, staffing transitions and escalation of enforcement actions occurring in early 2012 resulted in significant pressure on Legent and disruption to Legent's ongoing business operations.

### Bussing's Ongoing Employment with Legent

42.     After Bussing began employment with Legent, she regularly received positive feedback regarding her performance from Sugarman, Salas, Frankel, and other officers, directors, and management of Legent and COR.  These positive statements included but were not limited to statements about Bussing's performance contained in reports and updates to COR's board of directors.  In addition, these positive statements included but were not limited to statements about Bussing's actions in implementing the Change of Control Plan and the principles, goals, and plans contained therein.

43.     On or about March 22, 2012, Bussing was awarded an equity incentive package or bonus by COR and Legent based on her performance.  This bonus was not required by the terms of Bussing's verbal employment agreement with Legent.

44.     On or about March 27, 2012, Bussing and Legent entered into a written employment agreement (the "Employment Agreement").  A true and correct copy of the Employment Agreement is attached hereto and incorporated herein as Exhibit "A."

45.     The Employment Agreement was backdated to January 1, 2012, but did not accurately reflect the verbal employment agreement that Bussing and Legent had previously negotiated and operated under.

46.     The Employment Agreement provides that under certain circumstances, Bussing's employment may be terminated prior to the expiration of the three-year term, but that severance and other amounts would be paid if such termination was not "for cause."

47.     On or about March 30, 2012, Bussing was awarded a cash performance bonus by COR and Legent based on her performance.

48.     While she worked as EVP, Bussing was included by Sugarman and others in the management, planning and strategy meetings for Legent held by COR.  This includes but is not limited to an invitation extended on or about April 19, 2012, to attend a planning/strategy session scheduled for May 7, 2012, in Los Angeles; and an invitation extended on or about April 24, 2012, to attend a shareholder and planning/strategy session scheduled for May 7, 2012, in Los Angeles.

49.     Upon information and belief, the equity incentive package, cash performance bonus, and invitations were intended by Defendants to induce Bussing, and did induce her, to continue employment and to enter the Employment Agreement, particularly to the extent terms differed from the verbal agreement, practice established to that point, Defendants' assurances, etc.

### FINRA's Continued Examination and Investigation and Rule 8210 Request

50.     On or about Wednesday, April 25, 2012, Bussing received an e-mail from FINRA containing a request pursuant to FINRA Rule 8210 to provide documents and information (the "Rule 8210 Document Request").  These Rule 8210 Document Request required these documents and information to be compiled and available to FINRA when they arrived at Legent's office in Omaha on Monday, April 30, 2012.

51.     The Rule 8210 Document Request required Bussing and Legent to respond fully, promptly and without qualification or risk sanctions, including a permanent bar from the securities industry and rescission of FINRA licenses.

52.     Bussing immediately began preparing a response to the Rule 8210 Document Request.  In the course of preparing that response and in discussing matters with other Legent employees, she identified several potential or existing violations of FINRA rules and federal securities laws, including significant violations of the Bank Security Act and anti-money laundering provisions that would likely be revealed to FINRA during their visit to Legent's upcoming offices.

53.     During this time frame, Frankel was Legent's anti-money laundering officer and was primarily or ultimately responsible for Legent's compliance with anti-money laundering provisions.

54.     On or about Thursday, April 26, 2012, Salas met with Bussing in Omaha and told her that he, other members of COR management, and COR at large supported her and her actions completely.

55.     During this time frame, Sugarman also expressed his support of Bussing and her actions, as well as the support of other members of COR's management and COR at large.

56.     Upon information and belief, expressions by Salas and Sugarman were intended by Defendants to ratify and encourage Bussing's actions and induce her to continue employment, and did induce her to do so.

57.     On or about Friday, April 27, 2012, in response to the Rule 8210 Document Request and her identification of violations, Bussing directed Legent staff to cease processing penny stock certificates. This decision was based, in part, on lack of qualified staff to conduct

adequate certificate review and processing procedures and negative feedback from FINRA related to Legent's prior review and processing of such certificates.

58.     Bussing also directed Legent staff to perform several transactional audits and account reviews, including an audit of all third-party foreign wires during 2011 and 2012 to learn more about the potential Bank Security Act and anti-money laundering violations.

59.     On or about Friday, April 27, 2012, Salas met with Bussing in Omaha and expressed dissatisfaction with the response to the Rule 8210 Document Request and the decision that Legent cease processing penny stock certificates.  Salas advocated ignoring or responding incompletely to the Rule 8210 Document Request, and expressed skepticism that FINRA would take action against Legent and/or COR.

60.     In response, Bussing explained FINRA could immediately restrict Legent from certain business activities that were not being conducted in compliance, including but not limited to processing penny stock certificates.  Bussing also opposed Salas' skepticism and expressed her opinion that negative action by FINRA against Legent, COR, and associated FINRA-licensed personnel was probable or likely – and was even more likely if Bussing's actions were reversed and certain of Legent's business activities continued without correction.  Bussing's opinions were based on the tone, tenor, and allegations in the FINRA examination and investigation so far, and her industry experience.

61.     Bussing continued the same course of action and preparations for the Rule 8210 Document Request and FINRA's arrival, and assembled and led a team of 15 Legent employees to work over the weekend prior to FINRA's arrival on Monday morning.

62.     On or about Sunday, April 29, 2012, at Legent's offices, Sime told Bussing to cease preparing a response to the Rule 8210 Document Request and her audit work related to

anti-money laundering compliance. Sime became extremely agitated and raised his voice to Bussing several times.

63.     After confronting Bussing initially, Sime called Salas. Sime then confronted Bussing a second time, and again became extremely agitated and raised his voice to Bussing, prompting Bussing to state that she would call security to have him removed from her office.

64.     Bussing continued the same course of action and preparations for the Rule 8210 Document Request and FINRA's arrival.

65.     In the course of preparing a response to the Rule 8210 document request and performing and reviewing the audit work, Bussing determined that Legent was noncompliant with FINRA Rules and other laws and regulations in numerous ways, including but not limited to: processing incoming wires from Venezuela, Columbia, Ecuador, Panama, Africa, the Middle East, and Caribbean islands; conducting no anti-money laundering review; receiving and processing instructions in Spanish despite having no staff who could adequately read or speak Spanish; depositing funds in accounts in the United States, Canada, and Switzerland, that in some or many cases had registrations different from the source of funds.

66.     On or about Sunday, April 29, 2012, Bussing issued a report to COR (and Sugarman, Salas, and Frankel) and Legent's new CCO with findings and recommendations about the audit and anti-money laundering provisions. Bussing's report alleged that Legent had processed transactions that violated the Bank Security Act and anti-money laundering provisions on a daily basis throughout 2011 and 2012 and had correspondents that were likely using Legent to facilitate material or significant money laundering activities.

67.     Bussing noted in her report that the written instructions Legent received from its correspondents to authorize the wire transactions were, in many cases, signed or initiated by

personnel that had recently been suspended from the industry by FINRA, in the Spanish language, or otherwise appeared questionable.

68.     Bussing also noted in her report that Legent did not have paperwork on file to compare customer signatures or confirm that the paperwork was authentic and that no one at Legent was fluent in Spanish.

69.     Bussing discussed the findings identified in the Report with Legent and COR management, including but not limited to Sugarman, Salas, and Frankel, and made recommendations for compliance with anti-money laundering requirements and corrective actions.

70.     Bussing was directed by Legent and COR management, including but not limited to Sugarman, Salas, Frankel, and Legent's new CCO to stall, delay, stop digging, and stop responding to the Rule 8210 Document Request or FINRA.  Bussing continued the same course of action and preparations for the Rule 8210 Document Request and FINRA's arrival.

71.     FINRA was at Legent's Omaha office from April 30 to May 3, 2012, and examined Legent's response to the Rule 8210 Document Request.  Bussing participated in the onsite exam.

72.     By this time, criminal defense counsel had been retained, who also participated in FINRA's onsite exam at Legent's Omaha office from April 30 to May 3, 2012.  The criminal counsel told Bussing she did "a good job" with the exam and handled the related matters well.

**Retaliation Against Bussing and her Constructive Discharge and Termination**

73.     On Friday, May 4, 2012, Salas met with Bussing in Omaha and informed her that he, Sugarman, and COR (and its other officers and directors, including Frankel) had determined that Bussing would be required to take a mandatory "vacation" immediately.  Salas also

informed Bussing that after her "vacation," her position with Legent would be significantly changed (i.e., she would be demoted and would no longer allowed to implement the Change of Control Plan).  Instead, Salas would become acting CEO as soon as he obtained the requisite FINRA or other licenses.  Salas also instructed Bussing to give him access to all of her files.

74.     While Bussing was absent from the office, she heard from various Legent staff members that she had been fired as of May 4, 2012, and that Frankel was "dancing on Julie's grave."  Upon information and belief, these items were communicated to Legent staff by members of COR and Legent management, including but not limited to Sugarman, Salas, and Frankel.  At a minimum, members of COR and Legent management, including but not limited to Sugarman, Salas, and Frankel were aware of these statements but failed to address them.

75.     On or about May 12, 2012, Salas informed Bussing he was now EVP, and that although she had previously managed approximately 80 employees (all of Legent's employees save Frankel), she would no longer manage any employees. Salas also informed Bussing that she was not allowed to return to Legent's office.

76.     Bussing contested these changes.

77.     On or about May 20, 2012, Bussing met with Sugarman and Salas, but left the meeting after Sugarman engaged in abusive behavior toward Bussing.  Sugarman then informed Bussing via email that her employment was terminated.

78.     On or about May 21, 2012, Bussing received a letter from Salas stating her employment with Legent had been terminated for cause.  Upon information and belief, the letter was also directed or authorized by Frankel and Sugarman.

79.     On or about June 19, 2012, Bussing received a copy of the Form U5 (Uniform Termination Notice for Securities Industry Registration) completed by Legent and filed with

FINRA.  The Form U5 stated that Bussing was discharged and provided an explanation that she: "did not perform position consistent with company expectations."

## FINRA Settlement and Fine

80.     On or about December 16, 2013, FINRA accepted Legent's offer to settle the examination and investigation described above.  As part of the settlement, Legent was required to pay a fine of $1 million, submit certain additional certifications to FINRA regarding its compliance, and to undergo additional compliance overhaul (specifically related to the anti-money laundering regulations, among other requirements) by an independent consultant.  A true and correct copy of FINRA's Order accepting the settlement is attached hereto and incorporated herein as Exhibit "B."

## RETALIATION IN VIOLATION OF THE DODD-FRANK ACT, 15 U.S.C. § 78u-6

81.     Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

82.     Bussing engaged in protected activity under the Dodd-Frank Act, 15 U.S.C. § 78u-6. This protected activity includes, but is not limited to: compliance with the Rule 8210 Document Request, cooperation during the FINRA examination and investigation, and preparation of her report regarding Bank Security Act and anti-money laundering violations.

83.     All of such protected activity by Bussing was required or protected by law, rules or regulations within the SEC's jurisdiction, including but not limited to, SEC and FINRA rules designated for registered broker-dealers to comply with the Bank Secrecy Act and USA Patriot Act.

84.     In retaliation for Bussing's protected activity, Defendants altered the terms and conditions of Bussing's employment with Legent, demoted Bussing, and terminated Bussing's employment with Legent.

85.     As a direct and proximate result of Defendants' retaliatory actions, Bussing has suffered and will continue to suffer injuries and damages, the exact nature and amount of which are impossible to ascertain at the present time but which will be determined at trial.  These damages include, without limitation: lost wages; harm to reputation; loss of employment opportunities and earning capacity; mental suffering and distress; and, pursuant to 15 U.S.C. § 78u-6(h)(1)(C), reinstatement, double back pay, with interest, and all costs, expenses, and attorney's fees.

## WRONGFUL TERMINATION IN VIOLATION OF
## NEB. REV. STAT. §§ 20-148 and 48-1114(3)

86.     Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

87.     Defendants violated Neb. Rev. Stat. §§ 20-148 and 48-1114(3) by altering the terms and conditions of Bussing's employment with Legent, demoting Bussing, and terminating Bussing's employment with Legent because Bussing engaged in protected activity.

88.     Bussing's protected activity includes, but is not limited to: compliance with the Rule 8210 Document Request; cooperation during the FINRA examination and investigation; rejection of any suggestion that she should fail to comply and cooperate with FINRA; directives to cease processing penny stock certificates and preparation of her report regarding Bank Security Act and anti-money laundering violations; and opposition to and refusal to carry out, allow to continue, condone, etc., any violations of FINRA rules or federal law, including but not limited to the Bank Security Act and anti-money laundering laws.

89.     All of such protected activity by Bussing was in opposition to Defendants'

unlawful practices and was a refusal by Bussing to support or endorse, explicitly or implicitly, or

carry out actions unlawful under federal laws and the laws of Nebraska.

90.     As a direct and proximate result of Defendants' retaliatory actions, Bussing has

sustained suffered and will continue to suffer injuries and damages, the exact nature and amount

of which are impossible to ascertain at the present time, but which will be determined at trial.

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

91.     Bussing incorporates the allegations of the foregoing paragraphs as if fully set

forth herein.

92.     Defendants violated common law and public policy by altering the terms and

conditions of Bussing's employment with Legent, demoting Bussing, and terminating Bussing's

employment with Legent.

93.     The public policy violated includes but is not limited to:

    i.     the policies expressed (but not necessarily strictly defined by) the Dodd-

    Frank Act whistleblower protections, 15 U.S.C. § 78u-6,  and Neb. Rev. Stat. §§

    20-148 and 48-1114(3);

    ii.     the public policy of protecting "whistleblowers," which encourages

    employees to report suspected wrongdoing to the proper authorities to expose the

    wrongdoing, to prevent further wrongdoing, and to aid in the investigation and

    prosecution of the wrongdoers.  The wrongdoing reported can include activities

    that violate statutes, regulations, constitutional provisions, the common law, or

    codes of ethics.  Under this public policy, a "whistleblower" may or may not fit a

    statutory definition, but their actions are nonetheless protected against retaliation

or termination, particularly (but not only) when the whistleblower's actions are related to a public policy generally expressed by statute or other source, or serve to protect the public's health, safety, or welfare.

94.      Bussing's protected activity includes, but is not limited to: compliance with the Rule 8210 Document Request; cooperation during the FINRA Proceedings; rejection of any suggestion that she should fail to comply and cooperate with FINRA; directives to cease processing penny stock certificates and preparation of her report regarding Bank Security Act and anti-money laundering violations; "whistleblowing" to FINRA and internally regarding Bank Security Act and anti-money laundering violations; and opposition to and refusal to carry out, allow to continue, condone, etc., any violations of FINRA rules or federal law, including but not limited to the Bank Security Act and anti-money laundering laws.

95.      Termination of an employee on this basis or in this manner violates the public policy of Nebraska and federal public policy.

96.      As a direct and proximate result of Defendants' retaliatory actions, Bussing has sustained, suffered and will continue to suffer injuries and damages, the exact nature and amount of which are impossible to ascertain at the present time, but which will be determined at trial.

**BREACH OF CONTRACT**

97.      Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

98.      Bussing entered into the Employment Agreement with Legent as set forth above.

99.      Bussing performed her obligations under the Employment Agreement and complied with any condition precedent to Legent's performance of the Agreement, or such condition(s) were waived.

100.    The Employment Agreement provides that if Bussing is terminated without cause, certain severance payments must be made.

101.    Defendants' termination of Bussing was without cause.

102.    Defendants have breached the Employment Agreement by failing to make the specified severance payments to Bussing.

103.    As a direct and proximate result of Defendants' breach of the Employment Agreement, Bussing has suffered and will continue to suffer injuries and damages, the exact nature and amount of which are impossible to ascertain at the present time, but which will be determined at trial.

## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

104.    Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

105.    Bussing entered into the verbal employment agreement and the written Employment Agreement with Legent as set forth above.

106.     Legent had a duty of good faith and fair dealing with respect to Bussing.

107.    Legent breached its duty of good faith and fair dealing.

108.    As a direct and proximate result of Legent's breach of its duty of good faith and fair dealing, Bussing has suffered and will continue to suffer injuries and damages, the exact nature and amount of which are impossible to ascertain at the present time, but which will be determined at trial.

## TORTIOUS INTERFERENCE

109.    Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

110.    Bussing had valid business relationships or expectancies with Legent and COR.

111.    Defendants, and each of them, had knowledge of said relationships or expectancies.

112.    Defendants intentionally acted to interfere with said relationships or expectancies, and such interference was unjustified.

113.    Defendants' interference caused harm to Bussing, who was thereby damaged in an amount to be determined at trial.

114.    Particularly to the extent their conduct might be considered privileged, COR and the other Defendants acted with an improper purpose, which will be shown through their conduct, motive, Legent's interests, the interests advocated and pursued by the Defendants, the social interests involved, the relations between the parties, and the nature and proximity of the contractual relations involved.

115.    Particularly to the extent their conduct might be considered privileged, COR and the other Defendants acted with wrongful means, including but not limited to threats, intimidation, and trespassing or infringing on Bussing's rights and professional autonomy required by her licenses.

116.    Particularly to the extent their conduct might be considered privileged, COR and the other Defendants acted detrimentally to Legent's economic interests.  Actions taken by Defendants that were contrary to Legent's economic interests include but are not limited to interference with an official regulator's examination and with Bussing's compliance with the regulator; threatening, intimidating, and pressuring termination of a high-level employee who had positive economic impact on Legent and positive performance feedback; and allocating resources and employee time to hide legal and ethical violations.

## NEGLIGENCE

117.    Bussing incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

118.    Defendants had duties of reasonable care to perform its obligations to accurately report Bussing's income and other contract-related or employment-related information to the Internal Revenue Service and other appropriate authorities.

119.     Defendants breached its duties of reasonable care, by failing to accurately report Bussing's income and other contract-related or employment-related information to the Internal Revenue Service and other appropriate authorities.  ways that include but are not limited to:

120.    As an actual and proximate result of Defendants' breaches, Bussing has suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Julie A. Bussing respectfully prays that the Court enter judgment in favor of Bussing and against Defendants, and each of them, as follows:

A.      Judgment in favor of Plaintiff and against Defendants for general and special damages in an amount to be determined;

B.      Judgment in favor of Plaintiff and against Defendants for pre-and post-judgment interest;

C.      An order requiring the amendment of Bussing's Form U5;

D.      An order requiring the issuance of corrected reports, forms or other information to the Internal Revenue Service or other appropriate authorities;

E.      An order awarding Bussing her costs, expenses, and attorneys' fees as permitted by law; and

F.      Such other and further relief as the Court deems just and proper.

DATED June 11, 2014.

                                      FOR JULIE A. BUSSING, Plaintiff,

                                      By:   */s/J.L. Spray*

                                                J.L. Spray, #18405
                                                Patricia L. Vannoy, #24264
                                                MATTSON, RICKETTS, DAVIES,
                                                    STEWART & CALKINS
                                                134 South 13th Street, Suite 1200
                                                Lincoln, Nebraska 68508-1901
                                                Telephone:  (402) 475-8433
                                                Facsimile:  (402) 475-0105
                                                E-mail:  jls@mattsonricketts.com

                                      By:   */s/ David M. Gaba*

                                                David M. Gaba, #17960
                                              Compass Law Group PS, INC
                                              2600 Second Avenue, Suite 2302
                                              Seattle, WA 98121
                                              Ph: (206) 251-5488
                                              E-mail: davegaba@compasslegal.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 11, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Marcia A. Washkuhn
Gillian G. O'Hara
Kasey M. Cappellano
Kutak Rock, LLP
The Omaha Building
1650 Farnam Street
Omaha, NE   68102-2186

_/s/ J.L. Spray_
Attorney of Record

# Exhibit

# "A"

**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into effective the 1st day of January, 2012 (the "Effective Date") by and between Legent Clearing L.L.C., a Delaware limited liability company (the "Company"), and Julie Bussing, an individual residing in Nebraska (the "Executive").

WHEREAS, the Company wishes to retain the services of the Executive to assist in the ongoing management and business operations of the Company, and the Executive is willing to provide such services in accordance with the terms and conditions set forth in this Agreement; and

WHEREAS, the Company and the Executive desire that the terms and conditions of this Agreement govern the Executive's employment with the Company.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties to this Agreement, the parties agree as follows:

1. <u>Initial Term of Employment</u>. The Company hereby agrees to employ the Executive and the Executive hereby accepts employment with the Company, upon the terms set forth in this Agreement, for the period commencing on and as of the Effective Date, and continuing for a period of three (3) years following the Effective Date (the "Initial Term"), or until terminated in accordance with the provisions of Section 9 below.

2. <u>Renewal Period</u>. Following the expiration of the Initial Term, the term of this Agreement may be extended for successive periods of one (1) year ("Renewal Period") upon the mutual agreement of the Company and the Executive. Each Renewal Period expires after twelve (12) consecutive months and must be renewed, if at all, in writing on or before the expiration of the Renewal Period.

3. <u>Position and Executive Duties</u>. During the Initial Term of employment (and any Renewal Periods), the Executive shall serve as Executive Vice President of the Company. In that capacity, the Executive shall perform all functions, responsibilities, supervision and duties commensurate with and customary to such position, and such other reasonable duties and responsibilities as are necessary for the Company's daily management and business operations. The Executive shall report directly and concurrently to the Chief Executive Officer ("CEO") at the Company, the CEO at COR Securities Holdings, Inc. ("COR Securities"), and, as necessary or required, to the Company's Board of Directors ("Board"). The Company reserves the right to modify the Executive's duties and title at any time without altering the remaining terms and conditions of the agreement.

4. <u>Best Efforts/Full-time</u>. The Executive will expend the Executive's best efforts on behalf of the Company, and will abide by all policies and decisions made by the Company, as well as all applicable federal, state and local laws, regulations and ordinances. The Executive

will act in the best interest of the Company at all times and perform all functions and duties in a professional manner.  The Executive shall devote the Executive's full business time and efforts to the performance of the Executive's assigned duties for the Company.  The Executive shall perform all functions, responsibilities and duties assigned to the Executive faithfully and diligently.

  5.  <u>Work Location</u>.  The Executive's principal place of work shall be located in Omaha, Nebraska or at another mutually agreed upon location if in the best interest of the Company.

  6.  <u>Compensation</u>.

  6.1  <u>Annual Base Salary</u>.  During the Initial Term of employment (and any Renewal Periods), unless otherwise agreed in writing, the Company shall pay the Executive as compensation for her services an annual Base Salary equal to One Hundred and Eighty Thousand Dollars ($180,000) (the "Base Salary"), provided that for the period January 1, 2012 to March 31, 2012 only, the Base Salary shall be a pro-rated amount equal to Two Hundred Thousand Dollars ($200,000) per annum.  The Base Salary will be paid in equal, semimonthly or monthly installments in accordance with the Company's normal payroll practices, less all applicable tax and other withholdings.

  6.2  <u>Retention Bonus</u>.  In addition to the Executive's Base Salary, the Company shall pay the Executive a one-time retention bonus in the amount of Twenty-five Thousand Dollars ($25,000), to be paid in a single lump sum on or before the Effective Date.

  6.3  <u>Relocation Expenses</u>.  In addition to the Executive's Base Salary, the Company shall reimburse the Executive up to Twenty-five Thousand Dollars ($25,000) for the reasonable costs of relocating the Executive's principal residence to Omaha, Nebraska.  This amount shall be dispersed as follows: (a) the Executive shall be paid one lump sum in the amount of Thirteen Thousand Dollars ($13,000) on or before the Effective Date, to be used by the Executive at the Executive's discretion for costs associated with relocation; and (b) the Executive shall be reimbursed up to the amount of Twelve Thousand Dollars ($12,000) upon submitting appropriate supporting documentation to the Company related to unpaid expenses associated with relocation.

  6.4  <u>Incentive Compensation</u>.  In addition to the Executive's Base Salary, the Company shall pay the Executive incentive compensation during the Initial Term of employment.  During the first calendar year of the Initial Term of employment, the incentive compensation will be based on the Company's net operating income ("NOI") calculated in accordance with generally accepted accounting principles ("GAAP"), including the effects of the proposed incentive compensation award, but adjusted to exclude the effects of any extraordinary Company losses or other adverse effects arising from events occurring or commitments made prior to the Effective Date, which losses are not adequately reserved for on the Company's December 31, 2011 balance sheet, and the effects of any platform investments that could be capitalized but were recorded as expenses, all as determined by the Board in its

2

sole discretion.  The formula for calculation of incentive compensation for the first calendar year is attached to this Agreement as Exhibit A.  During the remainder of the Initial Term of employment following the expiration of the first calendar year, the incentive compensation will include NOI targets and other strategic priorities to be determined by the Board in its sole discretion.

(a)     Restricted Stock.  The Executive will be granted annually a number of shares of restricted common stock of COR Securities in an amount to be determined in the Company's sole and absolute discretion; provided, however, that this amount shall be no greater than either (i) fifty percent (50%) of the Executive's annual incentive compensation or (ii) a value of One Million Dollars ($1,000,000) per annum.  The shares shall vest over a two-year period, one-third immediately upon grant, and one-third on each anniversary of the grant date in equal installments, subject to the Executive's continued employment, at a value equal to (i) in the event the COR Securities' common stock is traded on a national market or exchange, the higher of the closing price per share on the date of the grant and the average closing price per share over the preceding thirty (30) trading days and (ii) in all other events, the greater of (A) $10.00 per share, or (B) the price per share of the Company's most recent round of equity financing in excess of $1.0 million.   Upon the Executive's termination by the Company without Cause during the Initial Term, the shares shall be fully vested.

(b)     Cash Bonus.  The Executive will be granted an annual cash bonus equal to the difference between the Executive's incentive compensation award and the value of any restricted stock grant made for the same period pursuant to the preceding paragraph.  For the first calendar year following the Effective Date, the Executive will receive a cash bonus equal to Twenty-Five Thousand Dollars ($25,000) for the first quarter and Thirty Thousand Dollars ($30,000) per quarter for the second, third and fourth quarters (the "Advance Bonus"), regardless of NOI achievement, and all remaining earned incentive compensation, if any, will be paid at year-end without duplication of the Advance Bonus.  For all other calendar years during the Initial Term, the amount of the Advance Bonus shall be reduced to Five Thousand Dollars ($5,000) per quarter.

7.     Compliance with Section 409A.   This Agreement will be interpreted and administered in a manner that is consistent with Section 409A of the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder (collectively, "Section 409A"), including any published guidance issued by the Internal Revenue Service.

8.     Tax Withholding.  All payments to be made under this Agreement shall be reduced by applicable income and employment tax withholdings.

9.     Termination; Payments on Termination.  The employment of the Executive by the Company pursuant to this Agreement may terminate upon the occurrence of any of the below-listed grounds:

3

9.1     Nonrenewal.   The Executive's employment with the Company will terminate upon nonrenewal of the Renewal Period as set forth in Section 2 hereof;

9.2     Death.    The Executive's employment under this Agreement shall terminate upon the Executive's death;

9.3     Disability.   The Company may terminate the Executive's employment under this Agreement if the Board determines in good faith that the Executive is physically or mentally incapacitated and has been unable for 90 days in any 120-day period to perform the Executive's duties under this Agreement.  For purposes of this Agreement, the Executive will be deemed to be disabled when the Executive has become unable, by reason of physical or mental disability, to satisfactorily perform the Executive's essential job duties and there is no reasonable accommodation that can be provided to enable the Executive to perform such duties consistent with applicable law;

9.4     Termination by the Company for Cause.  The Company may terminate the Executive's employment under this Agreement for Cause at any time immediately upon written notice to the Executive.  For purposes of this Agreement, "Cause" shall mean (i) the Executive's commission of, or conviction or plea of guilty, no contest or *nolo contendere* for, any felony, any crime involving moral turpitude, or any material regulatory violation resulting from Executive's gross negligence or willful misconduct; (ii) the Executive's commission of fraud, theft or the like, embezzlement, misappropriation or breach of fiduciary duty or duty of loyalty to the Company; (iii) the Executive's gross negligence or willful misconduct in the performance of the Executive's duties; (iv) the Executive materially or persistently fails or neglects to perform or carry out the Executive's duties and obligations under this Agreement or the Company's policies or procedures or places the Company at material risk of liability resulting from Executive's gross negligence or willful misconduct; (v) the Executive materially or persistently refuses or neglects to comply with any lawful and reasonable order given to the Executive by the Company, COR Securities or the Board; (vi) the Executive breaches any term or condition of this Agreement, including, but not limited to, the covenants, terms or provisions of Sections 3, 4, 10, 11 and 12 hereof, or any other agreement with the Company or the Board; or (vii) the Executive engages in the unlawful use (including being under the influence) or possession of illegal drugs or possesses illegal, unpermitted or unregistered weapons during working hours or on the premises of the Company;

9.5     Termination by the Company without Cause.   The Company may terminate the Executive's employment under this Agreement without "Cause" (as defined herein) at any time immediately upon written notice to the Executive; provided, however, that as a courtesy to the Executive, the Company would endeavor (but not be required to) provide at least two (2) weeks' prior written notice of any such termination;

9.6     Termination by the Executive.   The Executive may terminate the Executive's employment under this Agreement at any time immediately upon written notice to the Company; provided, however, that as a courtesy to the Company, the Executive would

4

endeavor (but not be required) to provide at least two (2) weeks' prior written notice of any such resignation; and

        9.7    <u>Termination by Mutual Consent</u>.  The parties may terminate the Executive's employment under this Agreement at any time by mutual consent.

        9.8    <u>Severance</u>.  In the event the Executive's employment with the Company is terminated by the Company <u>without Cause</u> pursuant to Section 9.5, the Executive shall be entitled to payment of accrued but unpaid Base Salary or vacation time owed to the Executive pursuant to the Company policy or practice or applicable law, a pro rata share of the incentive compensation for the period of employment, as calculated by the Board at year end, any reimbursable expenses properly incurred and submitted by the Executive, and severance in an amount equal to One Hundred Thousand Dollars ($100,000); <u>provided</u>, <u>however</u>, that as a condition to receiving any such severance payments, the Executive shall be required to execute an agreement that includes among its terms and conditions a nondisparagement covenant and a release of any and all claims against the Company, in form and substance satisfactory to the Company, as determined in its sole and absolute discretion.  Such severance payment shall be payable in a lump sum within 15 days after execution of the aforementioned agreement; <u>provided</u>, <u>however</u>, that any amounts payable in respect of incentive compensation shall be payable after such amounts are calculated after year end.

        9.9    <u>Payments Upon Termination</u>.  If the Executive's employment with the Company is terminated for any reason other than <u>without Cause</u> pursuant to Section 9.5, the Executive shall not be entitled to receive any payments or benefits, other than the Executive's accrued but unpaid Base Salary or vacation time owed to the Executive pursuant to the Company policy or practice or applicable law and any reimbursable expenses properly incurred and submitted by the Executive.

        9.10    Any and all payments made by the Company to the Executive shall be subject to customary payroll practices, including, without limitation, with respect to deductions for income and employment taxes withheld.

        9.11    Notwithstanding any termination of this Agreement, the Executive, in consideration of the Executive's employment through the date of such termination, shall remain bound by the terms and conditions of Sections 10, 11 and 12, which relate to periods, activities or obligations upon or subsequent to the termination of the Executive's employment.

        10.    <u>Nondisclosure</u>.  The Executive recognizes and acknowledges that the Executive will acquire knowledge of Confidential Information (as hereinafter defined) and that such information constitutes valuable, special and unique property of the Company and its affiliates. The Executive will not, at any time (whether during the Executive's employment by the Company or thereafter), divulge, furnish or make accessible to anyone or use in any way (other than in the ordinary course of the business of the Company or by law) any Confidential Information.  The Executive acknowledges that the Confidential Information is material to the value of the Company, and is unique, and agrees that disclosure thereof in violation of this

Agreement may irreparably damage the Company. "Confidential Information" means information, not generally known and proprietary to the Company (or any affiliate of the Company) or to a third party for whom the Company (or any affiliate of the Company) is performing work, including, without limitation, information concerning any patents or trade secrets, confidential or secret drawings, formulas, patterns, compilations, programs, devices, methods, techniques, codes or processes, directly or indirectly useful in any aspect of the business of the Company (or any affiliate of the Company), any customer or client contact information, customer names and/or lists, contract terms, customer needs and/or preferences, vendor or supplier names and/or lists, cost lists, system drawings and marketing plans of the Company, any confidential secret development or research work of the Company, or any other confidential information or proprietary aspects of the business of the Company. All information which the Executive acquires or becomes acquainted with during the period of the Executive's employment, whether developed by the Executive or by others, which the Executive has a reasonable basis to believe to be Confidential Information, or which is treated by the Company (or any affiliate of the Company) as being Confidential Information, shall be presumed to be Confidential Information. Both during and after employment, the Executive will refrain from any acts or omissions that would reduce the value of such knowledge or Confidential Information to the Company (or any affiliate of the Company).

11.     <u>Nonsolicitation of Customers</u>.  The Executive recognizes and acknowledges that the Company has a legitimate business interest in protecting the customer goodwill the Executive develops or maintains while employed by the Company against solicitation activities and unfair competition by the Executive for a limited period of time after the Executive leaves the Company in order that the Company may maintain, renew or restore its relationships with such clients or customers.  Therefore, during the period commencing on the Effective Date and ending on the 12-month anniversary of the termination of the Executive's employment with the Company for any reason whatsoever (whether by virtue of the Company's termination of the Executive's employment with or without cause, the Executive's voluntary termination of the Executive's employment, or otherwise) (the "Restricted Period"), the Executive shall not, either individually or on behalf of a person, firm, corporation, partnership, joint venture, association or other entity whatsoever, directly or indirectly, (i) solicit, sell to, divert, serve, accept or receive business from or endeavor to entice away from the Company, or (ii) attempt to solicit, sell to, divert, serve, accept or receive business from, or endeavor to entice away from the Company, any person, firm, corporation, partnership or entity of any kind whatsoever which was or is a client or customer of the Company, for which the Company performed services, with respect to any business, product or service that is competitive with the business, products or services offered by the Company, as of the date of the termination of the Executive's employment relationship with the Company.  This restriction shall apply only to such clients or customers of the Company with whom the Executive actually did business or had personal contact at any time during the twelve (12) consecutive months before the separation of the Executive's employment relationship with the Company.

12.     <u>Nonsolicitation of Employees</u>.  During the Restricted Period, the Executive shall not, either individually or on behalf of a person, firm, corporation, partnership, joint venture,

6

association or other entity whatsoever, directly or indirectly, solicit, induce or attempt to solicit or induce any of the Company's managers, directors, officers, employees, consultants or advisors with whom the Executive had personal contact during the Executive's employment and prior to separation from the Company, to discontinue his, her or its relationship with the Company.

13.    Injunctive Relief.  The Executive acknowledges and agrees that any breach by the Executive of any of the Executive's obligations contained in Sections 10, 11 and 12 hereof would cause irreparable injury to the Company, for which it would have no adequate remedy at law. The Executive agrees that in the event of any such breach, the Company shall be entitled to seek temporary, preliminary and permanent injunctive relief without the necessity of proving actual damages or posting any bond or other security in addition to any other relief to which the Company may be entitled and other remedies the Company may exercise under this Agreement or otherwise.

14.    Fringe Benefits.   The Executive shall be entitled to vacations, health care benefits, fringe benefits and reimbursement for reasonable out-of-pocket expenses, including, but not limited to, those hereinafter detailed, in accordance with Company policy and practices. Such benefits shall include:

14.1    Vacation.   The Executive shall be entitled to four (4) weeks of paid vacation per calendar year.  All vacation accrues pursuant to Company policy.  The time or times at which such vacation days are to be taken shall be reasonably determined by the Executive and those to whom the Executive reports, consistent with the Executive's duties and obligations under the Agreement and upon reasonable notice to the Company;

14.2    Sick Leave.   The Executive shall be entitled to annual sick leave in accordance with the Company's policy;

14.3    Benefits.  The Executive may participate in any major medical, dental or vision insurance programs and plans for which premiums will be funded by the Company, which are or may become generally available to the Executive, in accordance with Company policies;

14.4    Cellular Phone Expense.  The Company shall reimburse the Executive for the reasonable cost incurred by the Executive for monthly service of one (1) cellular phone, which is to be supplied by the Executive, during the Initial Term of employment (and any Renewal Periods);

14.5    Reimbursement of Expenses.  The Company shall reimburse the Executive in accordance with Company policy for all ordinary, necessary and reasonable business expenses incurred or paid by the Executive in connection with, or related to, the performance of the Executive's duties, responsibilities or services under this Agreement upon presentation by the Executive of documentation, expense statements, vouchers or such other supporting information as the Company may request;

14.6   <u>Laptop Computer</u>.   The Company shall supply the Executive with a Company-owned laptop computer for the Executive's use during the Initial Term of employment (and any Renewal Periods).  The Executive's use of the laptop computer is subject to all Company policies and procedures; and

14.7   <u>Desk/Workstation</u>.   The Company shall supply the Executive with a Company-owned desk for the Executive's use and a workstation located in the Company's main office in Omaha, Nebraska during the Initial Term of employment (and any Renewal Periods).

15.   <u>Return of Property</u>.   Immediately upon termination of the Executive's employment, the Executive will return to the Company all property, including, without limitation, all keys, computers, telephones, credit cards, Company files and documents and all copies thereof, whether in paper or electronic form, that are in the Executive's possession or under the Executive's control.  Notwithstanding the preceding sentence, the Executive shall be entitled to keep the cellular telephone and telephone number the Executive used in connection with Section 14.4 hereof.

16.   <u>Construction of Agreement</u>.  This Agreement shall be interpreted, construed and governed by and under the laws of the State of Nebraska, and the Executive unconditionally submits to the jurisdiction of the courts located in the State of Nebraska in all matters relating to or arising from this Agreement.

17.   <u>Entire Understanding</u>.  This Agreement represents the entire Agreement and understanding between the parties as to the subject matter herein and supersedes all prior or contemporaneous agreements whether written or oral.  The Company and the Executive each acknowledge and agree that this Agreement replaces in its entirety any written or oral agreement, offer letter or other arrangement prepared by or on behalf of the Company.

18.   <u>Modification</u>.   No modification of the terms and conditions of this Agreement shall be valid unless in writing and signed by all parties to this Agreement.

19.   <u>Successors and Assigns</u>.  This Agreement will be binding upon the Company and the Executive and will inure to the benefit of the Company and its affiliates, successors and assigns.  This Agreement shall not be assignable, in whole or in part, by the Executive.  This Agreement is assignable by the Company without the Executive's consent.

20.   <u>Indemnification</u>.  The Company shall indemnify the Executive against any and all expenses (including reasonable attorneys' fees) incurred by the Executive resulting from any and all actions, suits or proceedings which may be brought, commenced or prosecuted against the Executive by reason of the fact that the Executive is or was a director or officer of the Company acting within the course and scope of the Executive's employment with the Company.

21.   <u>Joint Preparation</u>.  This Agreement shall be deemed to have been prepared jointly by the parties hereto and any uncertainty or ambiguity existing herein shall not be interpreted against any party to this Agreement.

22.     <u>Severability</u>.  If any provision or clause of this Agreement is held to be invalid by a court of competent jurisdiction, then such provision shall be severed herefrom, and such invalidity shall not affect any other provisions of this Agreement the balance of which shall remain in and have its intended full force and effect.

23.     <u>Headings</u>.  The headings of the sections of this Agreement have been inserted for convenience of reference only and do not restrict or otherwise modify any of the terms or provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have read the foregoing Employment Agreement, fully understand each provision contained herein, and have executed this Employment Agreement as of the Effective Date.

Legent Clearing L.L.C.                               Julie Bussing, individual

By: _____                 By: _____
(Signature)                                          (Signature)

Steven Sugarman                               Julie Bussing
(Typed or Printed Name)                       (Typed or Printed Name)

9

**EXHIBIT A**

<u>Incentive Compensation Formula</u>

| Adjusted GAAP NOI for 12 months ended December 31, 2012 | | Incentive Compensation | |
|---|---|---|---|
| From (Ms) | To (Ms) | | |
| $ 0.02 | $ 1.00 | $ | 15,000 |
| 1.00 | 1.50 | | 65,000 |
| 1.50 | 2.00 | | 165,000 |
| 2.00 | 2.50 | | 315,000 |
| 2.50 | 3.00 | | 365,000 |
| 3.00 | 3.50 | | 415,000 |
| 3.50 | 4.00 | | 465,000 |
| 4.00 | 5.00 | | 515,000 |
| 5.00 | 6.00 | | 565,000 |
| 6.00 | > | | 615,000 |

10

# Exhibit

# "B"

## FINANCIAL INDUSTRY REGULATORY AUTHORITY
## OFFICE OF HEARING OFFICERS

| | |
|---|---|
| Department of Enforcement,<br><br>                              Complainant,<br><br>v.<br><br>Legent Clearing LLC<br>(n/k/a COR Clearing LLC),<br>CRD No. 117176,<br><br>                              Respondent. | Disciplinary Proceeding<br>No. 2009016234701<br><br>Hearing Officer MC<br><br><br>__ORDER ACCEPTING OFFER OF__<br>__SETTLEMENT__<br><br>Date:  December 16, 2013 |

### INTRODUCTION

Disciplinary Proceeding No. 2009016234701 was filed on April 23, 2012, by the

Department of Enforcement of the Financial Industry Regulatory Authority ("FINRA")

("Complainant").   Respondent Legent Clearing LLC, now known as COR Clearing LLC

("Respondent" or "the Firm"), submitted an Offer of Settlement ("Offer") to Complainant dated

December 10, 2013.  Pursuant to FINRA Rule 9270(e), the Complainant and the National

Adjudicatory Council ("NAC"), a Review Subcommittee of the NAC, or the Office of

Disciplinary Affairs ("ODA") have accepted the uncontested Offer.  Accordingly, this Order

now is issued pursuant to FINRA Rule 9270(e)(3).  The findings, conclusions and sanctions set

forth in this Order are those stated in the Offer as accepted by the Complainant and approved by

the NAC.

Under the terms of the Offer, Respondent has consented, without admitting or denying

the allegations of the Complaint (as amended by the Offer of Settlement) and solely for the

purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the entry of findings and violations consistent with the allegations of the Complaint (as amended by the Offer of Settlement) and to the imposition of the sanctions set forth below, and fully understands that this Order will become part of Respondent's permanent disciplinary record and may be considered in any future actions brought by FINRA.

## BACKGROUND

The Firm is based in Omaha, Nebraska, and has been registered with FINRA since June 4, 2002. The Firm primarily provides clearing services for approximately 86 correspondent firms through fully-disclosed clearing agreements. As a clearing firm, the Firm performs order processing, settlement and record keeping functions for introducing broker/dealers that do not maintain back-office facilities to perform these functions. The Firm changed its ownership in December 2011 and in September 2012 changed its name from Legent Clearing LLC to COR Clearing LLC.

The Firm has been the subject of two FINRA disciplinary matters that are relevant to this matter. In Letter of Acceptance, Waiver and Consent ("AWC") No. E0404008402 issued in December 2005, FINRA censured and fined the Firm $40,000 for violations of various securities rules, including SEC Rule 15c3-3 (customer protection). In AWC No. 200700713301 issued in December 2008, FINRA censured and fined the Firm $350,000 for violations of various securities rules, including NASD Rule 3011 and MSRB Rule G-41 (anti-money laundering compliance), NASD Rule 3010 (supervision), and SEC Rule 15c3-3 (customer protection).

## FINDINGS AND CONCLUSIONS

It has been determined that the Offer be accepted and that findings be made as follows:

## SUMMARY

1. During the period beginning in January 2009 through early 2013 (the "Relevant Period"), the Firm failed at times to meet its anti-money laundering ("AML"), financial reporting and supervisory responsibilities. The Firm had numerous violations in these areas, demonstrating a lack of supervisory controls and a failure by the Firm to devote adequate attention and resources to these important regulatory areas.

2. In that regard, examinations of the Firm from January through April 2009 and from February 24, 2012 through May 20, 2012 revealed that during those time periods, the Firm failed to (1) establish and implement policies and procedures reasonably designed to monitor for, detect and cause the reporting of transactions required under the Bank Secrecy Act ("BSA"), (2) establish and implement policies and procedures reasonably designed to achieve compliance with other requirements of the BSA and its implementing regulations, and (3) designate and identify to FINRA an individual responsible for implementing and monitoring the day-to-day operations of the AML program.

3. In addition, the Firm failed to prepare accurate customer reserve and net capital computations at times during the Relevant Period. The Firm also did not prepare accurate books and records as a result of its errors in net capital and reserve computations.

4. The Firm's repeated and consistent failures to comply with its AML, financial reporting and supervisory requirements resulted in violations of NASD Rules 1021, 3010, 3011, 3020, 3110 and 2110; FINRA Rules 1230, 3310, 4110, 4210, 4511 and

3

2010; SEC Rules 15c3-1, 15c3-3, 15c3-5, 17a-3, and 17a-5; and Rule 204 of

Regulation SHO by the Firm.

## RESPONDENT AND JURISDICTION

5.   The Firm is based in Omaha, Nebraska, and has been registered with FINRA since

June 4, 2002.  The Firm primarily provides clearing services for approximately 86

correspondent firms through fully-disclosed clearing agreements.  As a clearing firm,

the Firm performs order processing, settlement and record keeping functions for

introducing broker/dealers that do not maintain back-office facilities to perform these

functions. The Firm changed its ownership in December 2011 and in September 2012

changed its name from Legent Clearing LLC to COR Clearing LLC.

### FIRST CAUSE OF ACTION
### DEFICIENT AML POLICIES, PROCEDURES AND IMPLEMENTATION (2009)
### NASD CONDUCT RULE 3011(a) AND FINRA RULE 2010

6.   Between approximately January 1, 2009 and April 30, 2009, the Firm failed to

establish and implement policies and procedures that were reasonably designed to

detect and cause the reporting of transactions required under the BSA.

7.   During this time period, the Firm failed to implement a program to review

transactions in order to adequately detect and then evaluate the presence of potential

AML "red flags" with a view towards determining whether the presence of the "red

flags" required follow up reporting.

8.   For example, as part of its AML compliance program, for the period January through

April 2009, the Firm maintained a "tagged identifier list" ("TIL").  According to the

Firm's procedures, the TIL was a list of names, identification numbers and addresses

that were affiliated with individuals or entities that maintained high risk accounts at

4

the Firm in the past. The Firm's procedures at the time required that the TIL be checked against information obtained from a demographic AML ("DAML") information system, which consisted of customer identification information gathered by the introducing firms and maintained by a third party vendor.

9. However, not all of the Firm's introducing firms populated the DAML system, although checking the TIL against the DAML system was the method that the Firm used to determine whether customers had maintained a high risk account in the past. For those introducing firms that did not populate the DAML system, there was no customer identification information available in the DAML system. Customers of those introducing firms that did not populate the DAML system, contrary to the requirements of the Firm's written procedures, could not be checked for prior Firm accounts with potential red flags and suspicious activities.

10. In addition, the Firm failed to implement procedures to ensure that its employees were aware of established criteria for identifying red flags that were reasonably designed to monitor for suspicious activity. According to the Firm's procedures, a transaction required reporting through the filing of a Suspicious Activity Report ("SAR") if the transaction involved or aggregated "funds or other assets of at least $5,000" and certain other criteria was met related to the nature of the transaction that identified it as suspicious.

11. During the relevant period, instead of identifying and reporting those transactions that involved at least $5,000 and met the other specified criteria, the Firm identified accounts that had a current account value in excess of $5,000. As a result, the Firm

5

did not identify as suspicious or report, where appropriate, those transactions that involved activity in excess of $5,000 if the account value was below $5,000.

12. Moreover, the Firm failed to implement procedures reasonably designed to accurately and completely report suspicious activity through the identification and investigation of red flags.

13. Also during this time period, the Firm implemented what it called a Defensive SARS Program that promoted the filing of SARs without first completing a review to investigate the suspicious activity or red flags that may have been identified.  In implementing its Defensive SAR program, the Firm failed to establish procedures or implement a program that required, among others, the collection of sufficient and accurate information necessary to complete the SAR form, adherence to the guidelines for completing and filings SARS, and the retention of source documentation for the subject of its filings, including the internal exception reports.

14. Also, the Firm failed to implement procedures to ensure that timeframes and deadlines that were required by its written AML program were being followed, including those for Weekly AML Program Reviews and Risk Assessment Meetings.

15. As a result of the foregoing conduct, the Firm violated NASD Conduct Rule 3011(a) and FINRA Rule 2010.

### SECOND CAUSE OF ACTION
**INADEQUATE WRITTEN PROCEDURES
RELATED TO FBARS
AND FAILURE TO TIMELY FILE A FBAR (2008)
NASD CONDUCT RULES 3011(b) and 2110 and
FINRA RULE 2010**

16. During the calendar year 2007, the Firm had a foreign bank account with a balance in excess of $10,000.  As such, the Firm was required to file a Foreign Bank and

Financial Accounts Report ("FBAR"). A filing was due on or before June 30, 2008, but the Firm did not file the FBAR until approximately May 21, 2009.

17. The Firm failed to establish adequate written procedures and internal controls regarding the reporting of FBARs and failed to accurately state in its written procedures that the filing requirement was for accounts in excess of $10,000 as required by the BSA.

18. As a result of the foregoing conduct, the Firm violated NASD Conduct Rules 3011(b) and 2110 and FINRA Rule 2010.

### THIRD CAUSE OF ACTION
#### CUSTOMER PROTECTION RULE—RESERVES
#### YEAR 2009
#### SEC RULE 15c3-3 AND FINRA RULE 2010

19. SEC Rule 15c3-3 requires, among other things, that broker-dealers maintain with a bank or banks a "Special Reserve Bank Account for the Exclusive Benefit of Customers" ("Reserve Bank Account") which must be separate from any other bank account of the broker or dealer. The broker-dealer is required to deposit and maintain in the Reserve Bank Account an amount no less than the amount computed using the formula set forth in 15c3-3a ("Formula for Determination of Reserve Requirement for Brokers and Dealers"). The computation for determining the reserve requirement must be made weekly.

20. SEC Rule 15c3-3(e)(2) prohibits a broker or dealer from accepting or using any of the amounts under items comprising Total Credits under the formula except for the specified purposes indicated under items comprising Total Debits under the formula, and, to the extent Total Credits exceed Total Debits, at least the net amount must be maintained in the Reserve Bank Account.

21. There were three instances during the period of March through May 2009 when the bank loans of certain Firm customers decreased as of the reserve computation date, and were reinstated on the following business day. This required that the Firm's Customer Reserve Computations be adjusted to include the decreases in customer bank loans as credits. As a result of the adjustments, these three instances resulted in cumulative hindsight deficiencies of approximately $4.7 million.

22. As a clearing broker/dealer, the Firm must perform a computation for assets in the proprietary account of an introducing broker dealer ("PAIB assets"). There were additional inaccuracies in the PAIB Reserve Computation and the Customer Reserve Computation as of March 31, 2009. As a result of the inaccuracies in the PAIB Reserve Computation, adjustments increased the Firm's Customer Reserve Requirement by $207,090.

23. In addition, the Firm made several computational errors as of March 31, 2009 when it mistakenly included or excluded certain allocations in the Customer Reserve Computation.

24. As a result of the foregoing conduct, the Firm violated Rule 15c3-3 of the Exchange Act of 1934 and FINRA Rule 2010.

**FOURTH CAUSE OF ACTION**
**CUSTOMER PROTECTION RULE—CUSTODY**
**YEAR 2009**
**SEC RULE 15C3-3 AND FINRA RULE 2010**

25. SEC Rule 15c3-3(b) requires that a broker or dealer shall promptly obtain and thereafter maintain the physical possession or control of all fully paid securities and excess margin securities carried by a broker or dealer for the account of customers. The Firm violated this requirement in at least three instances in March 2009 by

delivering shares to bank loans when the Firm did not have enough excess shares to make those deliveries.

26. As a result of the foregoing conduct, the Firm violated Rule 15c3-3 of the Securities Exchange Act of 1934 and FINRA Rule 2010.

**FIFTH CAUSE OF ACTION**
**CUSTOMER PROTECTION RULE—RESERVES**
**YEAR 2010**
**SEC RULE 15C3-3 AND FINRA RULE 2010**

27. The Firm's weekly Customer Reserve Computations were also found to include numerous inaccuracies  A review of the Firm's weekly Customer Reserve Computation pursuant to 15c3-3 as of February 26, 2010 required the following adjustments:

    a.  The Firm over pledged customer securities held at the Bank of New York.  The customer bank loan agreement did not contain the appropriate no lien language.  Since the Firm also obtained a $5,000,000 unsecured bank loan with the same entity, the $5,000,000 should have been included as credit in the customer reserve formula.

    b.  The Firm incorrectly reflected $20,768,132 instead of $9,673,977 as both a debit and credit as its OCC margin requirement in the formula.  As a result, the Firm overstated customer debit and credit balances by $11,094,155.  The net impact to the reserve formula was favorable by $322,825 due to the three percent charge for the Alternative Method of Net Capital Computation.

    c.  The account number for the 15c3-3 Bay Cities Bank Customer Reserve Notification letter did not correspond to the Bay Cities Bank Customer Reserve Statement as of March 31, 2010.   As a result, the $5,024,979.18 on deposit did not qualify as a bona fide deposit for the weekly Customer Reserve Computation as of February 26, 2010.

    d.  The Firm failed to properly include certain other credits and debits, incorrectly included aged fails to deliver more than 30 calendar days old, and failed to include interest earned in the Customer Reserve Bank Account.

28. The above errors resulted in a customer reserve formula hindsight deficiency of $9,830,172 for the Firm.

9

29. The Firm did not have a process in place to identify and exclude unsecured and partly secured debit balances in proprietary accounts of introducing brokers from its PAIB Reserve Formula Computation and to calculate the required capital charges for partly secured accounts.

30. As a result of the foregoing conduct, the Firm violated Rule 15c3-3 of the Exchange Act of 1934 and FINRA Rule 2010.

## SIXTH CAUSE OF ACTION
### Customer Protection Rule - Custody (2010)
### SEC Rule 15c3-3 and FINRA Rule 2010

31. The Firm failed to properly classify securities in its custody or control. As of February 26, 2010, the National Securities Clearing Corporation ("NSCC") Long Free Account included four positions that were improperly considered to be in the possession or control of the Firm for more than fourteen calendar days.

32. As a result of the foregoing conduct, the Firm violated Rule 15c3-3 of the Exchange Act of 1934 and FINRA Rule 2010.

## SEVENTH CAUSE OF ACTION
### Procedures Related to Books and Records
### NASD Rules 3010 and 3110, and FINRA Rule 2010

33. From January through April 2009, the Firm failed to have written procedures for the solicitation and acceptance of checks from customers that were made payable to correspondents.

34. In addition, the Firm failed to evidence that it had obtained or reviewed written procedures from any of its correspondents that were allowed to offer check writing privileges to customers. The Firm did not obtain or review the correspondents'

10

written internal control procedures designed to monitor customer property that is made payable to the correspondents.

35. The Firm allowed one correspondent firm to provide check writing capabilities to its customers and two correspondent firms to solicit and accept checks from customers that were made payable to the correspondents.

36. The Firm did not maintain any records demonstrating that these check writing capabilities described above were included in the Firm's due diligence, vetting and approval process of the correspondents.

37. As a result of the foregoing conduct, the Firm violated NASD Rules 3010 and 3110 and FINRA Rule 2010.

**EIGHTH CAUSE OF ACTION**
**Inaccurate FOCUS Report**
**SEC Rules 17a-3 and 17a-5, and FINRA Rule 2010**

38. The Firm's February 26, 2010 FOCUS Report included several classification errors which resulted in misstatements on the FOCUS report and inaccurate books and records.  Those errors included aged suspense items that were erroneously included, and incorrect netting of unsecured receivables and non-customer payables.

39.  As a result of the foregoing conduct, the Firm violated Rules 17a-3 and 17a-5 of the Securities Exchange Act of 1934 and FINRA Rule 2010.

**NINTH CAUSE OF ACTION**
**Net Capital Computations**
**SEC Rules 15c3-1 and 17a-5, and FINRA Rule 2010**

40. As of February 26, 2010, the Firm was not in compliance with Rule 15c3-1 when it failed to take a net capital charge in the amount of $17,057 for aged suspense positions.

41. As of February 26, 2010, the Firm was not in compliance with Rule 15c3-1 when it failed to take the appropriate stock borrow deficit capital charge in the amount of $87,177.

42. The Firm was not in compliance with Rules 15c3-1 and 17a-5 as of February 26, 2010 when it improperly reconciled three foreign bank accounts by comparing the February 26, 2010 book balance to the February 25, 2010 bank balance for such accounts and failed to calculate a foreign currency net capital charge. The Firm also excluded a foreign currency balance in the Bank of New York account.

43. As a result of the foregoing conduct, the Firm violated Rules 15c3-1 and 17a-5 of the Securities Exchange Act of 1934 and FINRA Rule 2010.

**TENTH CAUSE OF ACTION**
**Fidelity Bond**
**NASD Rule 3020 and FINRA Rule 2010**

44. NASD Rule 3020 requires that each member required to join the Securities Investor Protection Corporation ("SIPC"), which includes the Firm, shall maintain a blanket Fidelity Bond covering officers and employees which provides against loss and has agreements within including a Cancellation Rider providing that the insurance carrier will use its best efforts to promptly notify FINRA in the event the bond is cancelled, terminated or substantially modified.

45. A review of the Firm's Fidelity Bond, dated October 18, 2009 through October 18, 2010, disclosed that the agreement did not state that FINRA would be notified if the Fidelity Bond is cancelled, terminated, or substantially modified.

46. As a result of the foregoing conduct, the Firm violated NASD Rule 3020 and FINRA Rule 2010.

## ADDITIONAL FINDINGS

Under the terms of the Offer, the Firm has also consented to the entry of findings and violations arising out of examinations of the Firm conducted by FINRA in 2011, 2012 and 2013, without admitting or denying the allegations, and solely for the purposes of this proceeding and any other proceeding brought by or on behalf of FINRA, or to which FINRA is a party, to the imposition of the sanctions set forth below, and fully understands that the Order Accepting Offer of Settlement will become part of the Firm's permanent disciplinary record and may be considered in any future action brought by FINRA.  The additional findings are described below.

## ANTI-MONEY LAUNDERING VIOLATIONS
### FINRA Rules 3310(a), (b), (d) and FINRA Rule 2010 (2012-2013)

### FINRA Rule 3310(a)

47. FINRA Rule 3310(a) requires each member to establish and implement policies and procedures reasonably designed to monitor for, detect and cause the reporting of suspicious transactions required under 31 U.S.C. § 5318(g), and the implementing regulations promulgated thereunder.

48. From February 24, 2012 to May 20, 2012, the Firm did not have an AML program that was reasonably designed to monitor for, detect and report suspicious activity in compliance with the BSA.  The Firm's AML program did not adequately address the risks of the Firm's business model, which included servicing introducing firms with significant numbers of accounts conducting activity in microcap securities, as well as third party wire activity.

49. The Firm's AML program relied in part on the introducing firms for surveillance of suspicious activity, even though the Firm did not conduct any review of the introducing firms' AML programs.

13

50. The Firm's procedures called for the use of manual reports for monitoring of suspicious activity, some of which had parameters that were not adequate to detect suspicious activity, and had limited staff and resources devoted to this monitoring. These limited staff and resources were inadequate to maintain a reasonable AML program for the Firm's clearing business.

51. In addition to having an AML system that was not reasonably designed to achieve compliance with the BSA, the Firm failed altogether to implement many parts of its program to monitor for, detect and report suspicious activity from February 24, 2012 through May 20, 2012. This failure is evidenced by the following findings:

   – The Firm did not update or review its internal reports that monitored for suspicious activities and tracked activities identified by the Firm as potentially suspicious. These internal reports were the Firm's primary methods for monitoring possible red flags of suspicious activities

   – The Firm's risk mitigation committee, described in its written AML program as a forum for discussion of potentially suspicious activity, did not meet.

   – The Firm did not investigate negative responses generated from McDonald Information Service checks on customers.

   – The Firm personnel did not report AML red flags and issues to the AML Officer for review as required by its procedures.

   – The Firm did not complete email reviews within its internal email search system, as required in its written AML program.

   – The Firm did not update its Tagged Identifier List, which was designed to verify that high risk accounts introduced by a correspondent firm that had been closed by the Firm had not been opened at another correspondent firm that cleared through the Firm.

   – The Firm did not review Letters of Authorization and wire transfer logs for suspicious activity and red flags.

   – The Firm allowed wire transfers to be sent to third parties in countries identified by the Firm as "watch list" countries without any heightened review of this activity as required by the Firm's procedures.

52. As a result of the foregoing conduct, the Firm violated FINRA Rules 3310(a) and 2010.

### FINRA Rule 3310(b)

53. FINRA Rule 3310(b) requires each member to establish and implement a written AML program reasonably designed to achieve and monitor the firm's compliance with the requirements of the BSA, as amended by the Patriot Act, (31 U.S.C. § 5311, et seq.), and the implementing regulations thereunder.

54. 31 C.F.R. 1010.610, which implements Section 312 of the Patriot Act, requires financial institutions to conduct due diligence on correspondent accounts for foreign financial institutions.  Specifically, this due diligence must include "appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to enable the covered financial institution to detect and report, on an ongoing basis, any known or suspected money laundering activity conducted through or involving any correspondent account . . . ."

55. From February 24, 2012 through May 20, 2012, the Firm failed to identify correspondent accounts for foreign financial institutions and conduct appropriate due diligence on these accounts.

56. As a result of the foregoing conduct, the Firm violated FINRA Rules 3310(b) and 2010.

### FINRA Rule 3310(d)

57. FINRA Rule 3310(d) requires each member to designate and identify to FINRA an individual responsible for implementing and monitoring the day-to-day operations of the AML program.

15

58. From March 23, 2012 through May 21, 2012, the Firm did not have an AML Officer with the appropriate training or knowledge required to function as an AML Officer.

59. As a result of the foregoing conduct, the Firm violated FINRA Rules 3310(d) and 2010.

**CUSTOMER RESERVE VIOLATIONS**
**SEC Rule 15c3-3 and FINRA Rule 2010**

60. The Firm made erroneous calculations in its weekly Customer Reserve Computation as of February 28, 2011. The Firm reported total credits of $137,995,575, when its total credits were actually $138,194,719. In addition, the Firm reported total debits of $148,938,064, when its total debits were actually $143,937,734.

61. The Firm made erroneous calculations in its weekly PAIB Reserve Computation as of February 28, 2011. The Firm reported total PAIB credits of $9,037,603, when its total PAIB credits were actually $8,855,638. In addition, the Firm reported total PAIB debits of $4,645,645, when its total PAIB debits were actually $4,209,993.

62. The Firm made erroneous calculations in its weekly Customer Reserve Computation as of November 30, 2011. These errors were caused by the Firm's failure to establish a process to identify and eliminate unsecured debits that resulted from IRA accounts, the Firm's improper netting of negative bank balances with positive bank balances, and the Firm's failure to establish a process to detect improper classification of Firm household accounts.

63. The Firm made erroneous calculations in its weekly Customer Reserve Computation and PAIB Reserve Computation as of November 30, 2012. These errors were caused by the failure to include certain credits or debits in the respective computations and from the failure to correctly code customer accounts as officer/director accounts.

16

64. In March 2011 and December 2011, the Firm made three deliveries of securities that created improper deficits in the Firm's securities positions. In another instance in March 2011, the Firm did not maintain sufficient excess margin securities under its possession or control.

65. As a result of the foregoing conduct, the Firm violated Rule 15c3-3 of the Securities and Exchange Act of 1934 and FINRA Rule 2010.

## NET CAPITAL VIOLATIONS
### SEC Rule 15c3-1 and FINRA Rule 2010

66. In November 2011, the Firm overstated its net capital by approximately $243,000 due to various misclassifications of allowable assets and improper netting of payable accounts on the Firm's general ledger.

67. In November 2012, the Firm made errors in its net capital computation, which resulted in the Firm amending its FOCUS report in order to correctly report its net capital position.

68. As a result of the foregoing conduct, the Firm violated Rule 15c3-1 of the Securities Exchange Act of 1934 and FINRA Rule 2010.

## SUPERVISORY VIOLATIONS
### NASD Rules 1021 and 3010; FINRA Rules 1230, 4110, 4210, 4511 and 2010; SEC Rules 15c3-5, 17a-3 and 17a-5; and Rule 204 of Regulation SHO

#### Regulation SHO Violations

69. From January 1 through April 30, 2011, the Firm did not properly complete delivery and close out requirements for fails to deliver under Regulation SHO in four instances. These failures led to improper long sales in multiple accounts that persisted for up to four months.

17

70. In addition, from August 2012 through February 2013, the Firm failed to have adequate written supervisory procedures ("WSPs") to address its compliance with Rule 204 of Regulation SHO. The existing procedures were out of date and addressed an older version of Rule 204.

71. As a result of this conduct, the Firm violated Rule 204 of Regulation SHO, NASD Rule 3010 and FINRA Rule 2010.

### Incorrect FOCUS Report

72. In February 2011, the Firm incorrectly reported a fail to deliver ("FTD") balance on the wrong line in its FOCUS report. As a result, the payable to non-customers was overstated and FTD was understated.

73. As a result of this conduct, the Firm violated Rule 17a-3 and 17a-5 of the Securities Exchange Act of 1934, and FINRA Rule 2010.

### Inadequate Supervision of Control Stocks

74. From May 2011 through January 2012, the Firm did not maintain written WSPs to identify control stock in customer margin accounts. As such, the Firm did not have a supervisory system in place to identify the impacts of control stock to its net capital and customer reserve computations..

75. As a result of this conduct, the Firm violated NASD Rule 3010, and FINRA Rules 4210 and 2010.

### Improper Outsourcing of Back-Office Functions

76. From May 2011 through January 2012, the Firm improperly outsourced certain back-office functions to a Canadian broker-dealer. The Canadian broker-dealer had a U.S.

subsidiary that was a correspondent of the Firm. The U.S. subsidiary received customer securities and forwarded them directly to the Canadian broker-dealer, and the Firm did not have an adequate reconciliation process for the deposit of securities in those circumstances. The Canadian broker-dealer also determined whether restrictive legends could be removed from customer securities and engaged Canadian transfer agents to remove restrictive legends, when the individuals performing these duties should have been associated with and supervised by the Firm.

77. In addition, from August 2012 through February 2013, the Firm failed to implement reasonable WSPs to address the arrangement with the Canadian broker-dealer. The Firm inappropriately continued to outsource its back office functions to the Canadian broker-dealer.

78. As a result of this conduct, the Firm violated NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Due Diligence of Microcap Securities</u>

79. The Firm's WSPs for microcap securities required the Firm to conduct due diligence on microcap securities before allowing its correspondents to sell those securities for its customers. The Firm failed to follow these WSPs in several instances in 2012 and 2013, as follows:

- On January 30, 2012, one of the Firm's correspondents received 2,500,000 shares of a microcap security in a customer account. These shares were sold out of the account from January 31, 2012 through February 2, 2012. The Firm failed to conduct adequate due diligence on these shares prior to their sale.

19

- In December 2012, one of the Firm's correspondents instructed the Firm to transfer 3,000,000 restricted shares of a microcap security on two occasions. The Firm did not conduct adequate due diligence on these shares before completing the transfers.

80. As a result of this conduct, the Firm violated NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Supervision of NSCC Illiquid Charges</u>

81. The Firm did not have adequate supervisory systems and WSPs to prevent customer transactions from materially increasing its National Securities Clearing Corporation ("NSCC") illiquid charges. In one instance in April 2012, the Firm's NSCC illiquid charge reached $5.3 million, primarily because of the trading by a correspondent's customer in a microcap security. The increase in the charge gave rise to a significant NSCC clearing fund requirement relative to the Firm's available cash. In order to meet the higher requirement, the Firm drew on its customer bank loan, which posed inappropriate risks to the Firm's ability to meet its customer reserve requirement.

82. In addition, although the Firm set a threshold for NSCC illiquid charges of $100,000 per security, the Firm did not establish an overall limit to mitigate its risk exposure in the aggregate.

83. As a result of this conduct, the Firm violated NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Supervision of an Executive's Email Account</u>

84. The Firm failed to retain and monitor the outside email account used by its Executive Vice President from January 1, 2012 through May 20, 2012. The Firm was aware

that its Executive Vice President was using an outside email account for securities business purposes and failed to require that the Executive Vice President submit these emails to the Firm for retention and monitoring.

85. As a result of this conduct, the Firm violated NASD Rule 3010, and FINRA Rules 4511 and 2010.

<u>Inadequate Controls for Fixed Income Trading Desk and Correspondent Order Flow</u>

86. From August 2012 through February 2013, the Firm failed to establish adequate financial and regulatory risk management controls and WSPs relating to market access of its fixed income trading desk and its correspondent order flow.  The inadequacies included the following:  (a) the Firm failed to establish processes and controls to systematically institute and enforce reasonable pre-trade credit and capital limits related to market access; (b) the Firm failed to establish and implement pre-trade risk management controls to prevent the entry of erroneous or duplicative orders; (c) the Firm failed to establish, document and maintain a system for regularly reviewing the effectiveness of risk management controls and supervisory procedures; and (d) the Firm failed to conduct the required Chief Executive Officer certification that the risk management controls and supervisory procedures surrounding its correspondent flow order were in compliance with the market access rules.

87. As a result of this conduct, the Firm violated SEC Rule 15c3-5, NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Controls Over Funding and Liquidity</u>

88. From August 2012 through February 2013, the Firm failed to implement adequate WSPs to address its internal controls over funding and liquidity.  Among other things,

21

the Firm did not conduct regular liquidity stress tests based on firm-specific and market-wide events for varying time horizons and varying levels of liquidity duress.

89. As a result of this conduct, the Firm violated NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Supervision of RVP/DVP Accounts</u>

90. From August 2012 through February 2013, the Firm's WSPs prohibited the sale of microcap securities in Receive Versus Payment/Delivery Versus Payment ("RVP/DVP") unless the accounts were properly documented and verified as prime broker executing accounts. There were 141 microcap security sale transactions during this time period that were executed in DVP accounts that were not prime broker executing accounts. These sales were contrary to the Firm's WSPs, and these transactions were not properly reviewed in accordance with the Firm's microcap security review policies. The Firm was aware that such transactions were occurring, but it failed to take any steps to enforce its WSPs.

91. As a result of this conduct, the Firm violated NASD Rule 3010 and FINRA Rule 2010.

<u>Inadequate Supervision of Principals</u>

92. On July 11, 2012, the Firm filed a Form BD amendment in which it reported that a new president had been put in place. As an officer of the Firm, this new president was required to be registered as a principal within 90 days. However, this president was not registered as a principal in that time period. In March 2013, FINRA discovered he was not registered as a principal and promptly notified the Firm of this

requirement. The Firm's president did not become registered as a principal until March 11, 2013, which was nine months after he became the Firm's president.

93. On another occasion, on April 1, 2012, the Firm promoted an individual to Manager of Operations. This individual functioned within the definition of an Operations Professional pursuant to FINRA Rule 1230 and was required to be registered as such. In March 2013, FINRA discovered she was not registered in any capacity and promptly notified the Firm of this requirement. The Operations Professional did not become registered in any capacity until April 19, 2013, which was over a year after she began acting as an Operations Professional.

94. As a result of this conduct, the Firm violated NASD Rules 1021 and 3010, and FINRA Rules 1230 and 2010.

Based on these considerations, the sanctions hereby imposed by the acceptance of the Offer are in the public interest, are sufficiently remedial to deter Respondent from any future misconduct, and represent a proper discharge by FINRA, of its regulatory responsibility under the Securities Exchange Act of 1934.

## SANCTIONS

It is ordered that Respondent be sanctioned as follows:

1. A censure;

2. A fine of $1,000,000;

3. For a period of one year, within five business days of each submission of its customer reserve and net capital computations made pursuant to SEC Rules 15c3-3 and 15c3-1, the Firm's Chief Executive Officer and Chief Financial Officer shall each certify to FINRA in writing that, on behalf of the Firm, they have

23

completed a review of the Firm's customer reserve and net capital computations

and that based on that review, as of the date of submission of each customer

reserve and net capital computation, the officers believe the computations to be

accurate. The written certification must be submitted to a person designated by

FINRA staff, and signed by both officers. The failure of FINRA staff to alert the

Firm of any deficiencies or inaccuracies in the customer reserve computations

submitted pursuant to this requirement shall not preclude FINRA from instituting

a subsequent disciplinary action as a result of deficiencies. For good cause shown

and upon receipt of a timely request, FINRA staff may extend the certification

deadlines, as set forth herein;

4.  In addition, the Firm shall:

    a.  Retain, within 30 days of the date of the Order Accepting Offer of

        Settlement, an Independent Consultant, not unacceptable to FINRA staff,

        to conduct a comprehensive review of the adequacy of the Firm's policies,

        systems and procedures (written and otherwise) and training relating

        to:  (1) the anti-money laundering rules and regulations; (2) the net capital,

        liquidity, and customer protection rules and regulations; (3) the

        supervision and supervisory control rules and regulations; and (4) for the

        period of the Independent Consultant's review through the submission of

        the Independent Consultant's report, the Independent Consultant shall

        conduct a risk assessment of any proposed clearing arrangements for the

        Firm.  In connection with this risk assessment, the Firm shall provide the

        Independent Consultant information collected pursuant to Notice to

Members 11-26 and risk-related information concerning the proposed correspondent. The risk assessment shall address, at a minimum, the potential impact on items (1) to (3) above. For the period between the retention of the Independent Consultant and fourteen days after submission of the Independent Consultant's report described below, the Firm shall continue to provide to FINRA the clearing agreement and materials required under Rule 4311, as well as the risk assessment prepared for the Firm by the Independent Consultant, in the event the Firm elects to clear for such proposed correspondent, for timely review and approval. Such approval may not be unreasonably withheld or delayed, and FINRA shall provide the Firm a written regulatory basis and opportunity to cure or respond regarding any clearing agreement that is not approved within 14 days of submission.

b.  Exclusively bear all costs, including compensation and expenses, associated with the retention of the Independent Consultant;

c.  Cooperate with the Independent Consultant in all respects, including by providing staff support. The Firm shall place no restrictions on the Independent Consultant's communications with FINRA staff and, upon request, shall make available to FINRA staff any and all communications between the Independent Consultant and the Firm and documents reviewed by the Independent Consultant in connection with his or her engagement. Once retained, the Firm shall not terminate the relationship with the Independent Consultant without FINRA staff's written approval;

25

The Firm shall not be in and shall not have an attorney-client relationship with the Independent Consultant and shall not seek to invoke the attorney-client privilege or other doctrine or privilege to prevent the Independent Consultant from transmitting any information, reports or documents to FINRA;

d.   At the conclusion of the review, which shall be no more than 90 days after the date of the Order Accepting Offer of Settlement, require the Independent Consultant to submit to the Firm and FINRA staff a Written Report.  The Written Report shall address, at a minimum: (1) the adequacy of the Firm's policies, systems, procedures, and training relating to the anti-money laundering rules and regulations; the net capital and customer protection rules and regulations; and the supervision and supervisory controls rules and regulations; (2) a description of the review performed and the conclusions reached; and (3) the Independent Consultant's recommendations for modifications and additions to the Firm's policies, systems, procedures and training; and

e.   Require the Independent Consultant to enter into a written agreement that provides that for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any other employment, consultant, attorney-client, auditing or other professional relationship with the Firm, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such; provided, however, that for purposes of this paragraph

26

neither Banc of California, Inc. nor any of its affiliates shall be considered affiliates of the Firm. Any firm with which the Independent Consultant is affiliated in performing his or her duties pursuant to the Order Accepting Offer of Settlement shall not, without prior written consent of FINRA staff, enter into any employment, consultant, attorney-client, auditing or other professional relationship with the Firm or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

5.  Within 30 days after delivery of the Written Report, the Firm shall adopt and implement the recommendations of the Independent Consultant or, if it determines that a recommendation is unduly burdensome or impractical, propose an alternative procedure to the Independent Consultant designed to achieve the same objective. The Firm shall submit such proposed alternatives in writing simultaneously to the Independent Consultant and FINRA staff. Within 30 days of receipt of any proposed alternative procedure, the Independent Consultant shall: (1) reasonably evaluate the alternative procedure and determine whether it will achieve the same objective as the Independent Consultant's original recommendation; and (2) provide the Firm with a written decision reflecting his or her determination. The Firm shall abide by the Independent Consultant's ultimate determination with respect to any proposed alternative procedure and must adopt and implement all recommendations deemed appropriate by the Independent Consultant.

6.  Within 30 days after the issuance of the later of the Independent Consultant's

    Written Report or written determination regarding alternative procedures (if any),

    the Firm shall provide FINRA staff with a written implementation report, certified

    by an officer of the Firm, attesting to, containing documentation of, and setting

    forth the details of the Firm's implementation of the Independent Consultant's

    recommendations.

7.  Upon written request showing good cause, FINRA staff may extend any of the

    procedural dates set forth above.

The sanctions imposed herein shall be effective on a date set by FINRA staff.


SO ORDERED.

                             FINRA

                             Signed on behalf of the
                             Director of ODA, by delegated authority

                             James M. Stephens
                             Senior Regional Counsel
                             FINRA Department of Enforcement
                             120 W. 12th Street, Suite 800
                             Kansas City, MO 64105
                             Phone: 816-802-4710
                             Fax: 816-421-4519
                             james.stephens@finra.org

                             Thomas Anderson
                             Principal Regional Counsel
                             FINRA Department of Enforcement
                             55 W. Monroe St., Suite 2700
                             Chicago, IL  60603
                             Phone: (312) 899-4673
                             Fax: (312) 899-4600
                             thomas.anderson@finra.org