IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JULIE A. BUSSING, | |
| Plaintiff, | 8:12-CV-238 |
| vs. | |
| COR CLEARING, LLC, et al., | MEMORANDUM AND ORDER |
| Defendants. | |

This matter is before the Court on the defendants' motion to dismiss and motion to strike. Filing 102. For the reasons discussed below, the defendants' motion to dismiss will be granted in part and denied in part, and their motion to strike will be denied. Although the Court will dismiss several claims in the plaintiff's operative complaint (filing 96), there is no need for her to submit a new amended complaint. She has not asked for leave to do so, and, in fact, has expressed a desire to progress this case more quickly.

## I. FACTUAL BACKGROUND

Plaintiff Julie A. Bussing has worked in the securities industry since 1989. She is licensed as a Certified Public Accountant, holds a Masters of Business Administration, and she has been qualified to hold several licenses with the Financial Industry Regulatory Authority (FINRA).[1] Filing 96 at ¶¶ 12–14. In 2011, Bussing began working as an independent contractor for defendant COR Securities Holdings, Inc. ("COR"), a private investment management company. During this period, Bussing was retained by and reported to defendant Steven Sugarman, who was a director of COR as well as its CEO. Filing 96 at ¶¶ 5, 15. Part of Bussing's duties involved assisting with the due diligence for COR's plan to acquire Legent Clearing, LLC ("Legent"). Legent, which is headquartered in Omaha, provides clearing services to brokerage clients, and is now COR's wholly owned subsidiary. Filing 96 at ¶¶ 2, 4, 15.

Before its acquisition by COR, Legent had been involved in several regulatory investigations and examinations. From 2009 to 2011, FINRA

---

[1] FINRA is a private, non-profit corporation that is registered with the Securities and Exchange Commission (SEC) as a "national securities association." *Aslin v. FINRA*, 704 F.3d 475, 476 (7th Cir. 2013). FINRA acts as a self-regulatory organization that oversees the securities market and creates and enforces rules which govern that industry, alongside and subject to significant oversight from the Securities and Exchange Commission. *Id.*

investigated and sanctioned Legent for various violations of FINRA rules and federal securities laws, including certain anti-money laundering provisions and the Bank Secrecy Act of 1970, 31 U.S.C. § 5311, *et seq*. Filing 96 at ¶¶ 18–23. Bussing learned of these issues through her investigation for COR. Filing 96 at ¶ 25. As part of her duties related to COR's acquisition of Legent, Bussing worked to develop a "Change of Control Plan." Filing 96 at ¶ 15. Among other things, the plan was designed to bring Legent's operations into compliance with the law. COR approved the plan for implementation immediately after it completed its acquisition of Legent, during the first half of 2012. Filing 96 at ¶¶ 16–17.

Around November 2011, Sugarman recruited Bussing to work for and lead Legent as its executive vice president. Filing 96 at ¶ 24. Bussing initially declined, citing Legent's "'troubling regulatory history.'" Filing 96 at ¶¶ 16, 25. Bussing claims that she was assured she would be authorized to implement the Change of Control Plan and that Legent would sign a long-term employment agreement with her. Filing 96 at ¶ 26.

Bussing and Legent entered into an oral employment agreement, which provided for, among other things, a 3-year term of employment, and allowed Bussing to report directly to Sugarman and COR's board of directors instead of Legent's CEO, defendant Christopher Frankel. Filing 96 at ¶¶ 7, 27. On January 1, 2012, Bussing began working for Legent as its executive vice president. Filing 96 at ¶ 28. Later, in March 2012, Bussing and Legent entered into a written employment agreement, which was backdated to her start date. Filing 96 at ¶¶ 44–45.

Bussing began implementing the Change of Control Plan in January 2012. Filing 96 at ¶¶ 29, 31. Around that same time, FINRA began another investigation of Legent, for the same types of violations that had been found in previous years. Filing 96 at ¶ 20. From January to April, FINRA sent several large document and information requests, and conducted onsite examinations of Legent, all of which resulted in "significant pressure" on Legent's compliance efforts and disrupted Legent's operations. Filing 96 at ¶¶ 36–41.

On April 23, 2012, FINRA instituted formal proceedings against Legent, alleging that during 2009 and 2010, Legent had failed to comply with the requirements of the Bank Secrecy Act, as well as anti-money laundering and financial reporting responsibilities imposed by various FINRA and SEC rules. Filing 96 at ¶¶ 21–22. On April 25, Bussing received a request from FINRA to provide documents and information, which were to be compiled and made available to FINRA staff when they arrived at Legent's office on April 30. Filing 96 at ¶ 50. Bussing alleges that in the course of preparing responses to the request, she identified several potential or existing violations of FINRA rules and federal securities regulations which FINRA was likely to discover,

including violations of the Bank Secrecy Act and certain anti-money laundering provisions. Filing 96 at ¶ 52.

On April 27, 2012, Bussing met with defendant Carlos Salas, a director of COR, who told Bussing that she had the support of COR management. Filing 96 at ¶¶ 6, 54. Sugarman similarly expressed his support of Bussing's investigations and disclosures. Filing 96 at ¶ 55. On April 27, based upon violations identified in response to the latest document request, Bussing directed Legent staff to cease processing penny stock certificates. Filing 96 at 57. Bussing also directed Legent staff to perform several transactional audits and account reviews, including an audit of all third-party foreign wires from 2011 and 2012. Filing 96 at ¶ 58. Later that day, Salas met with Bussing and expressed his dissatisfaction with Bussing's response to the document request and her decision to cease processing penny stock certificates. Bussing alleges that Salas advocated ignoring or responding incompletely to FINRA's document request. Filing 96 at ¶ 59.

Bussing alleges that she explained to Salas that FINRA could immediately restrict Legent from conducting certain activities that were not in compliance with the applicable rules or regulations, such as processing penny stock certificates. Bussing also predicted that negative action by FINRA was likely, and that it would be even more likely if her actions were reversed and certain business activities were continued without correction. So, Bussing continued to prepare a response to FINRA's document request. Filing 96 at ¶¶ 60–61.

On April 29, 2012, defendant Jeffrey Sime, an officer of Legent, instructed Bussing to cease preparing a response to the document request and to cease her audit of Legent's anti-money laundering compliance. Filing 96 at ¶¶ 8, 62. Bussing alleges that Sime was so agitated during their meeting that it prompted her to threaten to call security. Bussing also claims that Sime telephoned Salas and then confronted her again. Filing 96 at ¶¶ 62–63.

Later that day, Bussing issued a report to COR and Legent which detailed several violations of FINRA rules and certain anti-money laundering provisions, as well as deficits in Legent's internal record-keeping. The report stated that Legent had processed transactions that violated the Bank Secrecy Act and anti-money laundering provisions on a daily basis throughout 2011 and 2012, and that Legent had likely been used to facilitate money-laundering activities. Filing 96 at ¶¶ 64–68. Bussing discussed these findings with Legent and COR management, including Sugarman, Salas, and Frankel. Filing 96 at ¶ 69.

Bussing alleges that, in response, she "was directed by Legent and COR management, including but not limited to Sugarman, Salas, Frankel, and Legent's new CCO to stall, delay, stop digging, and stop responding to the [document request] or FINRA." Filing 96 at ¶ 70. Bussing refused, and

- 3 -

participated in FINRA's onsite examination of Legent's offices, which took place from April 30 to May 3. Filing 96 at ¶¶ 70–71.

On May 4, 2012, Salas allegedly notified Bussing that he, Sugarman, and COR's other officers and directors, including Frankel, had decided Bussing needed a "'vacation,'" and ordered Bussing to begin taking leave immediately. Salas also told Bussing that when she returned, she would be demoted and Salas would become Legent's CEO. Filing 96 at ¶ 73. Then, on May 20, Bussing was fired. Filing 96 at ¶ 77.

## II. STANDARD OF REVIEW
### A. Motion to Dismiss - Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* While the Court must accept as true all facts pleaded by the nonmoving party and grant all reasonable inferences from the pleadings in favor of the nonmoving party, *Gallagher v. City of Clayton,* 699 F.3d 1013, 1016 (8th Cir. 2012), a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. *Iqbal,* 556 U.S. at 678. Determining whether a complaint states a plausible claim for relief requires the Court to draw on its judicial experience and common sense. *Id.* at 679.

### B. Motion to Strike - Fed. R. Civ. P. 12(f)

Rule 12(f) provides that the Court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). While the Court has considerable discretion to strike pleadings under Rule 12(f), doing so is an extreme and disfavored measure. *BJC Health Sys. v. Columbia Cas. Co.,* 478 F.3d 908, 917 (8th Cir. 2007).

## III. ANALYSIS
### A. Motion to Strike

The Court begins with defendants' motion to strike, as it requires little discussion. Defendants first ask the Court to strike Bussing's allegations related to the verbal employment agreement that preceded her written contract with Legent, because the written contract contained an integration clause. The Court finds that it is too early to determine whether this did, in fact, render the verbal contract immaterial, as defendants claim. The enforceability of the

written contract, and its integration clause, are not properly before the Court at this time, and determining their status is not a proper use of a motion to strike.

Next, defendants move to strike paragraph 80 of Bussing's complaint, which alleges that

> [o]n or about December 16, 2013, FINRA accepted Legent's offer to settle the examination and investigation described above. As part of the settlement, Legent was required to pay a fine of $1 million, submit certain additional certifications to FINRA regarding its compliance, and to undergo additional compliance overhaul (specifically related to the anti-money laundering regulations, among other requirements) by an independent consultant. A true and correct copy of FINRA's Order accepting the settlement is attached hereto and incorporated herein as Exhibit "B."

Filing 96 at ¶ 80. Defendants have also moved to strike a copy of the FINRA order accepting the settlement that Bussing has attached to her complaint. Filing 96 at 37–65. As Bussing points out, however, these allegations relate to the same investigation that Bussing participated in, and tend to corroborate Bussing's allegations that Legent was violating the law. Defendants have not explained how they are prejudiced in any manner by the inclusion of these matters (which are public record) in the complaint, and their motion to strike will be denied.

Finally, defendants move to strike a *heading* contained in Bussing's complaint, which reads: "Retaliation Against Bussing and her Constructive Discharge and Termination." Filing 96 at p. 15. Defendants point out that Bussing has not brought a claim for "constructive discharge." But constructive discharge is not a separate claim, it is a way of showing that certain actions were tantamount to a termination, for purposes of other causes of action. And Bussing has alleged facts that may show she was constructively discharged: she was forced to take vacation, told she would be demoted upon her return, and allegedly subjected to abusive behavior. *See* filing 96 at ¶¶ 73–77. At this time, the Court need not determine whether these circumstances rise to a constructive discharge. But if they do, then her constructive discharge may be actionable as part of her claim for wrongful discharge in violation of public policy. *Cf.* Trosper v. Bag 'N Save, 734 N.W.2d 704 (Neb. 2007) (demotion held actionable). Any constructive discharge might also be actionable under Bussing's claim under 15 U.S.C. § 78u–6(h), which states that no employer may "discharge, demote, suspend, threaten, harass, directly or indirectly, *or in any other manner discriminate against*" an employee in retaliation for certain whistleblowing activities. (Emphasis supplied.) In sum, defendants' motion to strike is without merit and will be denied in its entirety.

B. MOTION TO DISMISS

Much of defendants' motion to dismiss is uncontested. In its previous order allowing Bussing to submit a third amended complaint (filing 93), the Court required Bussing to withdraw or replead certain claims for relief. In the complaint that she filed, Bussing inadvertently included certain claims that she agrees are no longer part of her case. So, Bussing agrees that her claim for negligence is brought only against the corporate defendants, and not against the individual defendants. Filing 105 at 4. She also consents to dismissal of her claims for breach of contract and breach of the implied covenant of good faith and fair dealing—as to her written employment agreement with Legent— against all of the individual defendants. Similarly, Bussing acknowledges that the Court previously found that she had not stated a claim for tortious interference with any business relationship or expectancy with COR, and agrees that any language to the contrary in her complaint was an inadvertent inclusion. Filing 105 at 6; filing 96 at ¶ 110. Finally, Bussing agrees that all claims against defendant Jeffrey Sime should be dismissed, with the exception of her claim against him for tortious interference with her relationship with Legent. Filing 105 at 8–9. That last claim is the focus of the pending motion to dismiss. Before proceeding to that claim, the Court will take a moment to sort through the claims that now remain in Bussing's operative complaint.

Bussing's complaint asserts eight theories of recovery, with each brought against all of the defendants unless otherwise noted: (1) retaliation in violation of 15 U.S.C. § 78u–6(h); (2) retaliation in violation of Neb. Rev. Stat. § 48-1114(3); (3) wrongful termination in violation of public policy; (4) breach of contract and (5) breach of the covenant of good faith and fair dealing, as to the written employment agreement (against Legent only); (6) breach of the covenant of good faith and fair dealing, as to the verbal agreement (against Legent only);[2] (7) tortious interference with her business relationship or expectancy with Legent (against all parties but Legent); and (8) negligence (against COR and Legent).

### 1. Bussing's Claim of Tortious Interference Against Sime

Bussing claims that each of the defendants (except for Legent) tortiously interfered with her employment relationship with Legent. Sime counters that, as an officer of Legent and Bussing's coemployee, he was not a "third party"

---

[2] Bussing has pleaded these claims as against all defendants. But her complaint alleges that the only parties to the verbal and written employment agreements were her and Legent. *See* filing 96 at ¶¶ 26–27, 44, 98, 105; and pp. 26–27, 96. Bussing acknowledges that these claims should not have been pleaded against the individual defendants. As the Court reads Bussing's complaint, the claim should also be dismissed as against COR, which was not a party to either agreement. But neither party has addressed this point, and so, for the time being, the claim will remain as against COR.

capable of interfering in the relationship between Legent and Bussing. In its previous Memorandum and Order of May 21, 2014, the Court expressly left this issue unresolved. Filing 93 at 6, 19–22. As to Sime, at least, the issue is now ripe for resolution.

To state a claim for tortious interference, Bussing must allege facts to support the following elements: (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damages. *Huff v. Swartz*, 606 N.W.2d 461, 466 (Neb. 2000). The first two elements are not in dispute: Bussing was employed by Legent, and Sime was aware of this. Sime focuses on the third element, arguing that he was not a third party capable of interfering in Bussing's employment relationship with their common employer, Legent. The Court agrees. As pleaded, Bussing's complaint does not state a tortious interference claim against Sime.

The Court begins with a basic observation. A contracting party cannot be held liable in tort for interfering with its own contract; so, a tortious interference claim requires a "third-party" interferer. *Id.* at 467 (citing *Nordling v. N. States Power Co.*, 478 N.W.2d 498, 505 (Minn. 1991)). Applying this seemingly straight-forward principle becomes complicated when, as here, the allegedly interfering party is the plaintiff's supervisor or coemployee, i.e., an agent of the contracting party.

Generally speaking, the agent of a principal cannot be held liable for interfering with a contract between the principal and a third party. *See, e.g.*, *Martin v. Johnson*, 975 P.2d 889, 896 (Okla. 1998). And a corporation can only act through its directors, officers, and agents. *Wiekhorst Bros. Excavating & Equip. Co. v. Ludewig*, 529 N.W.2d 33, 40 (Neb. 1995). It follows that if a corporation's agent is acting within the scope of his authority, his acts are acts of the corporation and there is only one actor. *Id.* Thus the question becomes, at what point does the coemployee become a "third party" subject to liability for tortious interference with the employment relationship of another on the basis of an unjustified intentional act? *Huff*, 606 N.W.3d at 467.

The *Huff* court observed that, in determining whether a defendant was a third party capable of interfering, other courts tend to draw a distinction between actions which fall within the general scope of the alleged interferer's authority as an agent of the employer and those which are in furtherance of some individual or private purpose not related to the interests of the employer. *Id.* Those courts reason that

> "[i]f a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with

- 7 -

> the company employer for breach of contract, not the agent individually for a tort. To allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation."

*Id.* (quoting *Nordling*, 478 N.W.2d at 505–06).

Stated differently, so long as the officer ""'acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the corporation.'"" *Id.* (quoting *Hickman v. Winston County Hosp. Bd.,* 508 So.2d 237, 239 (Ala. 1987) (quoting *Wampler v. Palmerton,* 439 P.2d 601, 607 (Or. 1968)). In another formulation of the rule, the plaintiff must show that the coemployee "was serving a master other than the employer or was pursuing 'some benefit to himself, at odds with the interests' of the employer." *Id.* at 467–68 (quoting *Wilcox v. Niagara of Wisconsin Paper Corp.,* 965 F.2d 355, 365 (7th Cir. 1992)).

These tests generally parallel the scope of employment principles set forth in the Restatement (Second) of Agency. *See, e.g.*, *Gruhlke v. Sioux Empire Federal Credit Union, Inc.*, 756 N.W.2d 399, 407–08 (S.D. 2008). Under the Restatement approach, conduct of a servant is within the scope of employment if, among other things, it is "actuated, at least in part, by a purpose to serve the master."[3] Restatement (Second) of Agency § 228; *see also,* Restatement (Second) of Agency §§ 229, 235, 236; *cf. Johnson v. Evers,* 238 N.W.2d 474, 430 (Neb. 1976) (utilizing § 228).

Taking the pleadings as true, Bussing has failed to allege facts from which a reasonable inference could be drawn that Sime's actions were taken in furtherance of some individual or private purpose not related to Legent's interests. Bussing alleges that, in the midst of her response to the FINRA's inquiries, Sime confronted her and demanded that she cease her investigation. Filing 96 at ¶¶ 62–63. Bussing claims that Sime's goal was to cover up Legent's past and ongoing violations of various securities laws and regulations. But according to Bussing's complaint, that was a goal shared by Legent. Bussing claims that Frankel (Legent's CEO), COR (the sole shareholder of Legent), and the remaining individual defendants (who ran COR) all interfered with her relationship with Legent, and that they did so in order to prevent her from exposing Legent's legal violations. *See* filing 96 at ¶¶ 59–78, 109–116.

---

[3] Many of the same general principles control under the Restatement (Third) approach, but they have been refined and consolidated. *See* Restatement (Third) of Agency § 7.07 cmt. b. Under its approach, an act is not within the scope of employment "when it occurs within an independent course of conduct not intended by the employee to serve *any* purpose of the employer." *Id.* § 7.07(2) & cmt. b (emphasis supplied). But, as the Court explains below, Bussing has not alleged any "mix" of motives on Sime's part. So, any difference between the second and third Restatements is immaterial.

- 8 -

Bussing has not alleged that the individual defendants were part of some cabal within Legent or COR, which were otherwise governed by separate actors who were dedicating to pursuing lawful business activities. Instead, she has alleged that Sugarman, Salas, and Frankel directed COR's activities, which, in turn (along with Frankel and, later, Salas), ran Legent. If Bussing's allegations are true, Sime's purpose was shared by the people who ran Legent, and thus Legent itself.

Bussing alleges generally that defendants' acts—interfering with an official regulator's examination; terminating "a high-level employee who had positive economic impact on Legent and positive performance feedback;" and allocating resources and employee time to hide legal and ethical violations— were contrary to Legent's economic interests. Filing 96 at ¶ 116. But that confuses the point. Taking Bussing's allegations as true, the defendants were acting to benefit Legent—albeit with an allegedly dishonest strategy that ultimately failed. Bussing has not alleged that the defendants were attempting to shift the blame onto Legent, away from themselves, in order to further some private purpose at Legent's expense. Defendants were allegedly hoping that they, and Legent, would ultimately stand to gain by keeping FINRA in the dark.

The question is not whether Sime's alleged conduct was socially desirable, or even legal. An action may be within the scope of employment although "forbidden, or done in a forbidden manner," *see* Restatement (Second) of Agency § 230, or even "consciously criminal or tortious." *See* Restatement (Second) of Agency § 231; *see also*, *Davric Maine Corp. v. U.S. Postal Service*, 238 F.3d 58, 66 (1st Cir. 2001); *Davis v. Devereux Foundation*, 37 A.3d 469, 490–91 (N.J. 2012). Sime's conduct was not forbidden by Legent. Quite the opposite— according to Bussing, the other actors who ran Legent shared Sime's illicit purpose and took their own steps to ensure Bussing did not ruin their plans. Two days before she was confronted by Sime, Bussing alleges that Salas advised her to ignore or evade FINRA's requests. Filing 96 at ¶ 59. Bussing alleges that it was the combined management of Legent and COR, including Sugarman, Salas, Frankel, and Legent's new CCO, who directed her to "stall, delay, stop digging, and stop responding." Filing 96 at ¶ 70. And Bussing alleges that it was them, not Sime, who decided to fire her. Filing 96 at ¶¶ 73–78.

The Court finds that Sime was acting within the scope of his employment. If that were all that *Huff* had to say on the matter, the Court's analysis would be at an end—since Sime was acting within the scope of his employment for Legent, he could not be considered a third party capable of interfering with Bussing's relationship with Legent. But, pointing to another portion of *Huff*, Bussing contends that the matter is not that simple.

In *Huff*, the Court first discussed the scope of employment test discussed above, citing variations of the test from several other states. *See Huff*, 606

N.W.2d at 467–68. Referring to these cases, the *Huff* court stated "[w]e agree with these authorities and hold that in order to constitute actionable interference with an employment relationship, actions of a coemployee must be shown to have been committed in furtherance of some purpose other than the lawful purposes of the employer." *Id.* at 468 (emphasis supplied).

In its previous memorandum and order, the Court recognized the potential significance of this language. Bussing has alleged a scheme by Legent, COR, and their management, to avoid compliance with various securities regulations and laws and to cover up their past violations. There is no way that such a scheme could be deemed a "lawful purpose" of Legent. If the quoted language from *Huff* is taken at face value, then Sime's conduct—which was taken in furtherance of his employer's unlawful purposes—renders him a third party for tortious interference purposes. The Court finds that, when *Huff* is considered in its entirety, this isolated sentence cannot reasonably be taken at face value.

First, this reading of a single sentence conflicts with the remainder of the reasoning in *Huff*. Summarizing its holding, the court later stated that "we hold that . . . an action [for tortious interference] may be maintained against a coemployee who acts as a third party to the relationship by taking actions for his or her own personal benefit, or for the benefit of an entity other than the employer." *Id.* at 470. Here, the court omitted any mention of a "lawful purpose" requirement. And the *Huff* court began its analysis by noting that, because a party cannot interfere with its own contract, it is first necessary to determine when a coemployee can be considered a "third person" capable of interfering with the contract. *Id.* at 467. In considering how that determination should be made, the *Huff* court discussed a variety of scope of employment tests from other jurisdictions, and then stated its agreement with the principles set forth in those cases. *Huff,* 606 N.W.2d at 467–68. But none of the cases cited in *Huff* contain the sort of "lawful purpose" requirement espoused by Bussing. *See, Wilcox,* 965 F.2d at 364–65; *Nordling,* 478 N.W.2d at 505–07; *Hickman,* 508 So.2d at 239–40; *Wampler,* 439 P.2d at 606–08. The *Huff* court could hardly have been agreeing with those decisions if it appended an alternative "lawful purpose" prong to its analysis.

Under Bussing's reading of *Huff*, whenever an employee acts with an unlawful purpose, then they are automatically considered a third party—never mind that the employee was acting within the scope of his employment, or even acting with a purpose shared and encouraged by his employer. In such cases, the scope of employment inquiry would be entirely unnecessary. That, in turn, would be inconsistent with the purpose of this entire analysis—to determine if the coemployee was acting as a third person, i.e., one not aligned with the interests of the employer. And that analysis goes to the very thing that this tort was meant to protect against: interference from "outside intermeddlers."

- 10 -

*Gruhlke*, 756 N.W.2d at 404; *see also, McGanty v. Staudenraus*, 901 P.2d 841, 845 (Or. 1995); *Printing Mart–Morristown v. Sharp Elecs. Corp.*, 563 A.2d 31, 38 (1989).

Moreover, the *Huff* court had no occasion to craft a rule for cases where an unlawful purpose was shared by the employer and coemployee. The facts of *Huff* were more straightforward. Huff alleged that his supervisor interfered with his relationship with their common employer by, among other things, threatening to fire him or transfer him to another facility, and by demoting him. *See Huff*, 606 N.W.2d at 465. The court found that, while Huff's supervisor may have "spoke and acted boorishly, there is no evidence that [he] did so in any capacity other than as [a company] manager addressing a job performance issue involving a subordinate employee." *Id.* at 469. In other words, the situation in *Huff* was nothing like the situation here. There was no need to decide whether, and under what circumstances, an unlawful purpose shared by an employer and a coemployee could give rise to a tortious interference claim. *Huff* should not be read as establishing a rule for such situations, as a case is not authority for any point not necessary to be passed on to decide the case. *Pribil v. Koinzan*, 665 N.W.2d 567, 576 (Neb. 2003).

Finally, Bussing argues that Sime and Legent could not actually have shared an unlawful purpose because, under Delaware's Limited Liability Company Act, Legent was only authorized to "carry on any *lawful* business." 6 Del. Code § 18-106(a) (West 2014) (emphasis supplied). The Court is not persuaded. This statute does not mean that limited liability companies are somehow *incapable* of breaking the law or acting with unlawful purposes. That would fly in the face of the well-established principle that corporate actors may be held liable for all manner of legal wrongs. Corporations—including limit liability corporations—may even be convicted of crimes. *See, United States v. Jorgensen*, 144 F.3d 550, 560 (8th Cir. 1998); *People v. Highgate LTC Mgmt., LLC*, 69 A.D.3d 185 (N.Y. App. Ct. 2009). This holds true even for offenses that require some degree of scienter or even specific intent (i.e., an unlawful purpose). *See, e.g.*, *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 909 (3d Cir. 1991); *Commonwealth v. Life Care Ctrs. of Am., Inc.*, 926 N.E.2d 206, 212–13 (Mass. 2010); *State v. Christy Pontiac-GMC, Inc.*, 354 N.W.2d 17 (Minn. 1984).

While Bussing has alleged that Sime acted with an unlawful purpose, it was apparently a purpose that Sime shared with Legent. Bussing has not pleaded any facts to suggest that Sime was acting outside the scope of his employment. Accordingly, the Court finds that Sime was not a third party capable of interfering with Bussing's employment relationship, and Bussing's final claim against Sime must be dismissed.

THEREFORE, IT IS ORDERED:

1. Defendants' motion to dismiss (filing 102) is granted in part and denied in part, as set forth above. In particular, all claims against defendant Sime are dismissed.

2. Defendants' motion to strike (filing 102) is denied.

Dated this 10th day of December, 2014.

                    BY THE COURT:

                    _____
                    John M. Gerrard
                    United States District Judge